Sterling RAULT, Sr.,
Petitioner-Appellant,

v.

STATE OF LOUISIANA,
Respondent-Appellee.

No. 85–3281.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1985.

Dwight Doskey, New Orleans, La., for petitioner-appellant.

Michael E. McMahon, Asst. Dist. Atty., New Orleans, La., for respondent-appellee.

Before CLARK, Chief Judge, RANDALL and GARWOOD, Circuit Judges.

On Application for a Stay of Execution Pending Appeal and for Certificate of Probable Cause

GARWOOD, Circuit Judge:

The district court denied Sterling Rault Sr.'s petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in which Rault sought to set aside his Louisiana first degree murder conviction and death sentence. That court likewise denied Rault's application for certificate of probable cause under 28 U.S.C. § 2253. Rault has filed a notice of appeal to this Court from the denial of his petition for habeas corpus. The case is now before us on Rault's application to this Court for a certificate of probable cause, the granting of which is a necessary condition to the maintenance of Rault's appeal. § 2253.[1] We deny Rault's application for certificate of probable cause and accordingly dismiss his attempted appeal.[2]

In passing on Rault's application for certificate of probable cause, we are guided by the standard "that a certificate of probable cause requires petitioner to make a 'substantial showing of the denial of [a] federal right.'" Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) (quoting Stewart v. Beto, 454 F.2d 268, 270 n. 2 (5th Cir.1971), cert. denied, 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 126 (1972)). See also Fabian v. Reed, 714 F.2d 39 (5th Cir.1983). We hold that Rault has failed to make such a showing.

PROCEDURAL BACKGROUND

Rault was charged in a March 19, 1982 indictment with first degree murder, on

1. We heretofore stayed Rault's execution "until further order of this Court, in order to permit this Court to make an informed decision on Rault's application to this Court for a certificate of probable cause." Rault's execution was scheduled for the early morning hours of the day following that on which our stay was issued, the district court had denied Rault's petition for habeas corpus in the late afternoon of the previous day, and none of the judges of this panel had received the record of the several-day state trial in which Rault was convicted and sentenced. Rault had expeditiously sought federal habeas relief following denial of his application for post-conviction relief in the state courts.

2. We likewise dissolve the stay of execution previously entered by this Court. See note 1, supra.

March 1, 1982, in Orleans Parish, of Jane Francioni, committed while Rault was engaged in perpetrating or attempting to perpetrate aggravated rape or aggravated kidnapping of the victim, contrary to LSA–R.S. 14:30(1). Rault pleaded not guilty and not guilty by reason of insanity. He was found competent to stand trial and, following a jury trial in the Orleans Parish Criminal District Court on October 4, 5, 6, and 7, 1982, was found guilty as charged. The jury, at the conclusion of the bifurcated trial's sentencing proceeding, recommended that he be sentenced to death and found three statutory aggravating circumstances, namely, (1) that he was engaged in the perpetration or attempted perpetration of aggravated rape or aggravated kidnapping; (2) that the offense was committed in an especially heinous, atrocious, or cruel manner; and (3) that the victim was an eyewitness to a crime alleged to have been committed by the defendant or possessed other material evidence against him. LSA–C.Cr.P. art. 905.4(a), (g), (h). On direct appeal by Rault, the Louisiana Supreme Court affirmed his conviction and sentence on January 16, 1984, and denied rehearing on February 15, 1984. *State v. Rault,* 445 So.2d 1203 (La.1984).[3] The United States Supreme Court denied Rault's petition for writ of certiorari on October 1, 1984. *Rault v. Louisiana,* —— U.S. ——, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984).[4] On October 23, 1984, Rault filed an application for post-conviction relief and stay of execution in the Criminal District Court of Orleans Parish. That court initially stayed Rault's execution pending an evidentiary hearing, which was held in March 1985, at the conclusion of which the court made findings adverse to Rault, denied all requested relief, and dissolved the stay. Rault thereafter applied for habeas corpus in the Louisiana Supreme Court, which unanimously denied his application without opinion on May 14, 1985.

Rault then filed his present petition for habeas corpus with the United States District Court for the Eastern District of Louisiana. That court, after examining the application and response, the record of the state trial, the opinion of the Louisiana Supreme Court, the minutes and order of the Louisiana trial court in the post-conviction proceedings there, and other submitted material, denied the petition without an evidentiary hearing. The court set out its reasons rejecting all of Rault's asserted grounds for relief in a well-considered twenty-one page opinion. For the same reasons, it denied Rault's application for certificate of probable cause.

Rault was represented by retained counsel at all stages of his trial, including pretrial proceedings, and he has also been represented by counsel on the direct appeal of his conviction, on his petition for writ of certiorari, on both of his state court applications for post-conviction relief, including the evidentiary hearing before the Louisiana trial court, and on his petition for writ of habeas corpus in the court below. He has likewise been represented by counsel in the proceedings in this Court.[5]

---

3. The action of the Louisiana Supreme Court was without dissent. The reported opinion indicates that "Dennis, J., concurs with reasons" and "Lemmon, J., concurs and will assign reasons." 445 So.2d at 1221. As of this writing, it is our understanding that no separate statement of reasons or concurring opinion has been filed by either Justice Dennis or Justice Lemmon. Accordingly, the only opinion is Justice Watson's opinion for the Court. 445 So.2d at 1206.

4. Justices Brennan and Marshall dissented from the denial of certiorari on the sole ground "that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments." *Id.*

5. Rault was represented at his October 1982 trial by attorneys Bernard Eugene ("Gene") Fulgham and Michelle Gaudin. Fulgham, who had practiced in Louisiana since 1974, was retained by Rault's family and consulted with him on March 2, 1982, but was replaced by another attorney (unidentified) within a week or two. Shortly thereafter, and before March 29, Fulgham was again retained and thereafter remained as Rault's counsel through the trial and sentencing in October 1982. Sometime later, apparently in late April 1982, Fulgham retained Gaudin to assist him, and she also remained as counsel through the trial and sentencing. Neither Fulgham nor Gaudin represented Rault after the trial court proceedings were completed in the fall of 1982. Attorney Dwight Doskey

In our consideration of Rault's application for certificate of probable cause, we have reviewed the record of his state trial, including the pleadings, motions, orders, minute entries, charges, and transcript of the proceedings and evidence, the opinion of the Louisiana Supreme Court, the pleadings, memoranda, minute entries, and transcript of the proceedings and evidence of the March 1985 state court post-conviction relief hearing and the court's findings made thereon,[6] the pleadings and memoranda in the Louisiana Supreme Court respecting post-conviction relief, and the record in the court below. We have likewise had the benefit of briefs by each party filed in this Court in support of and in opposition to Rault's request that we grant a certificate of probable cause.

## CLAIMS FOR RELIEF

As a basis for his request for certificate of probable cause, Rault presents five grounds of asserted constitutional infirmity in his state trial, as follows:

1. Denial of the right to participate in his own defense.

2. Denial of the right to testify.

3. Denial of the right to a cross-sectional jury by exclusion of potential jurors in accordance with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

4. Denial of due process by the State's presentation of evidence at the sentencing hearing of Rault's responsibility for other crimes.

5. Denial of a fair trial by the trial judge's failure to charge the jury that a reasonable doubt could arise both from the evidence and the lack of evidence.

These five claims, and no others, were raised in the petition for habeas corpus below. The first two claims above-listed were raised for the first time in October 1984 in the proceedings for post-conviction relief in the Louisiana trial court. The third claim was raised for the first time in Rault's 1985 application for habeas corpus to the Louisiana Supreme Court. The fourth and fifth claims were raised at trial and on direct appeal to the Louisiana Supreme Court.

## FACTUAL BACKGROUND

In evaluating Rault's claims, especially those respecting denial of participation in his own defense and of his right to testify, an understanding of the factual background is helpful. The Louisiana Supreme Court's opinion accurately describes the circumstances of the offense as disclosed by the evidence at trial, as follows:

"Sterling Rault was the Assistant Comptroller of LUTEX, where Janie Francioni worked as a secretary. On the evening of March 1, 1982, a Monday, fellow employees observed Rault and Francioni leaving work together in her car. Less than an hour later, three U.N.O. students saw the two struggling in the campus parking lot. Francioni screamed at the students, asking them to call the police and make him leave her alone, because he was attempting rape. The student closest to the car observed what appeared to be splashes of blood on her clothing. Rault repeatedly said he had to get her to the hospital, before throwing 'her into the car from the driver's side all the way to the passenger's side' (Tr. 50) and driving away.

"Approximately 9:20 P.M. that evening, a state trooper driving north on Paris Road in an isolated area of New Orleans East stopped to investigate what appeared to be a brush fire and discover-

---

commenced representing Rault in late October 1982, when he (joined by Fulgham) presented a motion for a new trial and new sentencing hearing to the trial court. Doskey's representation of Rault has continued since then, including representation on direct appeal, in all state court post-conviction proceedings, in the district court below and in this Court.

6. The district court did not have the benefit of the transcript of the testimony at the state post-conviction evidentiary hearing, although it did have the pleadings, memoranda, minute entries, and the court's findings, and tapes of the hypnotized interviews of Rault with Dr. Steck, the psychiatrist who testified on his behalf at trial.

ed a burning female body. Close by were a partially full five gallon gasoline can and Francioni's blood stained car, which smelled strongly of gasoline. A spent bullet was on the floor of the car.

"The victim had a man's belt wrapped around her neck and a jagged wound on the right side of her neck. She had been shot twice. One bullet had struck her in the thigh, traveling into the abdomen, through the small intestines, stomach and liver before exiting the left side of her chest. The pathologist testified that this would have caused extensive slow bleeding. The wound would have been very painful and would have resulted in death in 'less than a matter of hours.' (Tr. 21)[7] The second bullet entered directly into the abdomen, damaging blood vessels in the right kidney and the large blood vessel known as the interior vena cava, before lodging in the spine. This second bullet would have caused extensive, fairly rapid bleeding, and would have been fatal within five to ten minutes.

"The victim was dead when the neck wound was inflicted and she was set on fire. Her fingernail scrapings had human blood on them.

"Janie Francioni had been with her mother and a friend during the preceding weekend and had had no sexual encounters. Her mother took her to work that Monday morning. However, she had engaged in sexual activity twelve to twenty-four hours prior to her death.[8] Vaginal swabs showed seminal fluid but no sperm. Sterling Rault had a vascectomy [sic] in 1979.[9]

"When police searched the area, they detected movement under a nearby bridge. As they approached, a man broke and ran. After a brief chase, he turned around, threw up his hands, and hollered, 'I'm Sterling Rault'. (Tr. 87)

"Rault appeared quiet, calm and relaxed. Dressed in casual clothing, he was lacking a belt and had a strong aroma of gasoline. There were several fresh, red scratch marks across his chest and his right hand was very swollen. After being advised of his rights, Rault claimed two men in ski masks had kidnapped him and Janie Francioni and raped her.

"Testimony at trial revealed that Rault had been embezzling funds from LUTEX. Two checks, totaling over $84,000, payable to Jerry Jones, did not have Jones' endorsement but had cleared the company account. Rault had opened a B.N.O. checking account in February, 1982, under the name of Jerry Jones and deposited the two Jones checks into this account. Three checks were written on the account, two of them payable to Janie Francioni. Rault was with her when she cashed the first check. A handwriting expert established that Rault had signed the name of Jerry Jones on the checks. Rault had also used the name to order $62,000 worth of gold coins from a local dealer.

"In December, 1981, a .25 caliber Guardian semi-automatic pistol had been sold to a buyer with a driver's license in the name of Jerry Jones. In executing a search of Rault's residence, police recovered a gun box for a Guardian .25 caliber pistol, a box of .25 caliber cartridges and

---

**7.** We also note that the pathologist, when asked if this wound would have been fatal, replied, "Eventually there is a good possibility since the gunshot wound to the liver would bleed extensively but rather slowly. Eventually, if she had not received or did not receive medical care, it conceivably could have been fatal." (Tr. 21.)

We further observe that the evidence showed it was an approximately half-hour or more drive from the University of New Orleans to where the victim's body was found.

**8.** We believe that this is an inadvertent inaccuracy, the testimony being that the tests showed the victim had engaged in sexual activity twelve to twenty-four hours before the *tests,* not before her death (Tr. 31); the tests were taken at or shortly after 10:00 a.m. on March 2 (Tr. 19).

**9.** The doctor who performed the operation testified that Rault thereafter would secrete seminal fluid but not sperm during sexual intercourse (Tr. 176). Sperm would be expected to be detectable up to about twenty-four hours following intercourse (Tr. 27).

a Mississippi driver's license in the name of Jerry Jones.

"The bullets recovered from the victim's body and car were similar to the ammunition in Rault's residence. The two bullets found had been fired from the same gun and their markings were consistent with being fired from a Guardian gun.

"Jerry Jones testified that he had known the defendant for eight or nine years when both of them lived in Laurel, Mississippi, but he did not purchase a gun in 1981 and did not open a checking account at the Bank of New Orleans.

"Rault pled not guilty and not guilty by reason of insanity. In support of his insanity defense he offered testimony by a private investigator, who was also a certified hypnotist, and by a psychiatrist, Dr. Charles Steck. Both experts hypnotised [sic] him. While in a hypnotic trance, Rault claimed that three deceased persons orchestrated the day of the murder through post-mortem appearances. Elroy Coffey, Rault's first cousin who committed suicide in 1975, allegedly encouraged Rault to have sex with Janie Francioni.

"Under hypnosis, Rault also admitted he had scuffled with the victim at the U.N.O. parking lot, a gun had gone off injuring her, and he had taken her to New Orleans East. However, he claimed he tried to protect her from Elroy and another deceased cousin, Darryl, who maimed and beat her, drug her around with the belt and then set her on fire.

"It was the defense psychiatrist's expert opinion that Rault was 'in the process of becoming insane' (Tr. 323). When Rault is in a self-induced hypnotic trance, as on the night of the crime, he does not know the difference between right and wrong because 'he's in another world'. (Tr. 327) Although Rault is capable of inducing such trances during stressful situations, he otherwise exhibits no signs of mental illness. This psychiatrist admitted that generally a person under hypnosis will not do something

against his moral code and knows the difference between right and wrong.

"Dr. Kenneth Ritter, an expert in forensic psychiatry, who was a member of the sanity commission, stated that, in his opinion, Rault knew the difference between right and wrong at the time of the crime. Rault had had no prior treatment for mental disorder. According to Dr. Ritter, a person under hypnosis will not do something he is not predisposed to do. (Tr. 248) In the opinion of Dr. Dabney Ewin, an expert in hypnosis, it is not possible to self-hypnotize yourself, assume the personality of a dead person and murder or rape someone 'if it's against your moral code.' (Tr. 400–401)" 445 So.2d at 1206–08 (footnote omitted).

The victim, who was twenty-one, and Rault were both white. Rault had lived most of his life in New Orleans. The Louisiana Supreme Court further observed that Rault

"is a thirty-three year old white male, married and the father of two young children whom he lived with and supported. Defendant has a college degree and has been employed in the field of accounting at an annual salary in excess of $25,000 for several years." 445 So.2d at 1218.

The state trial record reflects that Rault received vigorous representation by his counsel both prior to and during trial and appeal. The record reflects numerous pretrial motions filed by defense counsel, including motions for preliminary examination and bail, filed March 11 and 17, 1982; motion for discovery and bill of particulars, motion to suppress identification because of allegedly suggestive photographic "line-up," and motion to suppress blood sample evidence, filed April 15; motion to produce results of handwriting analysis (conducted under court order over defense objection) and memorandum in opposition to the State's notice of intention to prove embezzlement, filed July 6; motion to change plea from "not guilty" to "not guilty and not guilty by reason of insanity," filed August 31; supplemental application for bill

of particulars and discovery, motion to limit *voir dire*, motion to sequester panel and allow individual *voir dire*, motion to allow demonstrative evidence in the form of Rault's testimony under hypnosis, motion *in limine* to exclude inflammatory photographic evidence, and motion to limit list of aggravating circumstances, filed September 30.[10]

On March 29, 1982, the trial court ordered a sanity examination, that matter was heard on April 15, and the court found on the basis of the reports of examination by the appointed physicians that Rault was "presently sane, and therefore, able to understand the proceedings against him and to assist in his defense."

On June 25, an evidentiary hearing was held on pending motions, principally the defense motions to suppress, at which some eight individuals, potential prosecution trial witnesses, testified. On July 12, the State presented its motion to introduce evidence of other crimes (embezzlement) and the defense submitted its opposition thereto. Rearraignment was had on September 2, with Rault and Fulgham present, on Rault's new plea of "not guilty and not guilty by reason of insanity," and the court granted the State's motion for mental examination by Dr. Strub and Clinical Psychologist Rummage.

Trial commenced October 4 and continued on October 5, 6, and 7. On the latter date, the jury found Rault guilty as charged, and, following a recess slightly in excess of two hours, resumed to commence the sentencing phase, which was completed the same day, the jury finding the above-mentioned three aggravating circumstances and recommending that Rault be sentenced to death. During trial, defense counsel made some five motions for mistrial, numerous objections to prosecution evidence, and cross-examined prosecution witnesses, as well as presenting defense witnesses. Following the jury's verdict on the sentencing phase, defense counsel Fulgham, joined by present counsel Doskey, moved for new trial and a new sentencing hearing. Doskey then represented Rault on appeal to the Louisiana Supreme Court, assigning some nine different assignments of error, all of which were rejected.

## DENIAL OF RIGHT TO PARTICIPATE IN DEFENSE AND TESTIFY

### The Three Stories

Rault told three different stories of the events of the evening of March 1. The first, or "Masked Men," version, was told to the arresting officers and initially to Rault's counsel, Fulgham and Gaudin. Under this version, two masked men had kidnapped Rault and the victim, raping and killing her. Another version, referred to as the "Elroy and Darryl" story, was related by Rault while hypnotized, first by William Bachemin, an investigator hired by the defense who was a certified hypnotist, and later by the defense psychiatrist witness, Dr. Steck. Under it, after the victim was accidentally shot, in the University of New Orleans (U.N.O.) parking lot, Rault had taken her away to help her, but his long-deceased cousins Elroy and Darryl appeared and maimed and beat her and then set her on fire. This version, also referred to in the above-quoted portions of the Louisiana Supreme Court's opinion, was presented at trial through the testimony of Bachemin and Dr. Steck, and was relied on by Dr. Steck in giving his testimony that Rault was insane during the events of the evening of March 1. Rault did not testify at trial. The remaining version, referred to as the "Good Samaritan" story, Rault commenced to relate to Fulgham about two months after Fulgham was retained. Under this story, the victim pulled the gun on Rault in the U.N.O. parking lot and was accidentally shot when Rault tried to deflect it; the subsequent events involved

---

10. Testimony at the state post-conviction hearing reflects that Fulgham met with Rault twenty-five to thirty times prior to trial, the meetings averaging two to three hours each. He also met frequently with Rault's wife. As the case neared trial, Fulgham's involvement became so great that he worked on no other cases.

Rault's efforts to save her and, when he realized she was dead, to cremate her in accordance with her previously expressed wishes.[11]

11. Fulgham's testimony at the March 1985 state post-conviction hearing describes the "Good Samaritan" story as Rault had related it to him: "He stated at that time that he and Miss Francioni had been involved in an embezzlement scheme at the place where they worked .... They did it as a, a way to get back at Elaine Pritchard, who was both their, their bosses .... Sterling had stated that he always intended to give the money back, and that had—something happened, ... anyway that they weren't able to do it on the date in which they were going to; that, Sterling said that Janie did ask him to ride out with her to—to U.N.O., that on the way they—he got in her car, as they were driving out they saw another employee who Sterling waived [sic] at. I understand from some of my other investigation that what's—what the employee states is that Sterling tried to slouch down in the seat. As they were driving out that Miss Francioni did give him a cigarette to smoke, that they drove out to U.N.O., and that on the way, I believe a—a—a knife that Sterling had fell out of his pocket, and that Francioni had asked for to keep the knife. He had earlier had given her a gun, which he had—had purchased some years back because he was, he was a little bit concerned because his cousins had committed suicide, and a couple of times he felt depressed and that he wanted to commit suicide [Rault admitted at the hearing that he had purchased the gun under an alias]. So, he had this gun and he—he gave it to Miss Francioni to give to a cousin or a brother who was on the sheriff's department to have destroyed. When they got to the U.N.O. parking lot they argued over whether or not the money would be given back. Sterling stating that he was going to give the money back, Miss Francioni saying no, ... her boyfriend had said that they would be fools to give the money back .... They argued, Janie pulled a—the gun out of her purse. They struggled with the gun and the gun went off. I believe he only said the gun went off three times. The—there was a policeman or campus security person that had driven by. Janie was—was—had been shot and that he tried to get the campus security, get his attention to get help for her but the guy drove off and didn't help at all. She—she got out of the car and Sterling said that no, we have got to take you to the hospital and put her back in the car. He saw some students there and he yelled to them to get in touch with a—a—an ambulance to meet them, that he was taking her to the hospital. They start—he moved her over and she gave him his—her keys, they—he started driving off. She said that she did not want to go to a hospital, that she wanted to go back across to Slidell to—to talk to her parents and that she wanted to tell them how sorry that she was that, you know, that this occurrence had—had happened, the embezzlement, and that it was not Sterling's fault that this happened. They were driving down I-10 and she began to become much worse, that she started coughing and that at one—and Sterling decided that he would have to take her back, take her to a nearer hospital. He pulled off on the overpass and he was trying to make a—a u-turn and go back because he had seen a hospital sign on the interstate. She became much worse, though, and—and she grabbed for him for support .... [H]e said that that must have been the time, how he got the scratches on his chest. They—when she grabbed him, he ran off the road and he realized that she was really at that point in serious difficulties .... [H]e pulled her out of the car and he tried to do a Heimlich maneuver because she was choking. She seemed to get a little bit better and she and he had a discussion about how, you know, this whole situation had came about .... She became worse and he felt that where he had put her he was close to the—the exhust pipe of the car and he had left the car running. So, he decided that it would be well to pull her away from the car. He could not lift her so put his—his belt around her neck and drug her away from the car. At that point she did not seem to be responding much so he thought that the only thing that could possibly save her would be a tracheotomy and he attempted to do that. I believe he had had a relative that was a nurse and she had told him about the procedure. I—he obviously did not know how to do it and apparently the cut was up in here, (indicating), somewhere, but at that point she had, she was definitely deceased at that point. He became extremely emotional, distraught, upset .... He remembered that Miss Francioni and he had discussed at one time the fact that what—the way they both wanted to be buried was to be cremated. So, he decided that—that that was the least of what he owed her; that he went and procured a—a gas can and gas and went back and—and doused the body and tried to set it on, and set it on fire. He then decided that he didn't want to live anymore either and he doused the automobile with gas and sat in the car, he threw the—tried to strike matches and throw it on top of the roof to, to set the car on fire. That was not successful and I believe I—I forgot at one point he did say that he called his wife and that his wife had told him that the police were looking for him, which was when he, about contemporaneously with going to purchase the gas. The car didn't light so he decided that he couldn't leave the gun there, and he went out and buried the gun someplace on—on the levee;

Rault's claim is that he was unaware of what he said under hypnosis, as Fulgham refused to disclose this to him; that Fulgham refused to allow him to testify, thus preventing the establishment of his "Good Samaritan" version of the events; and that Fulgham unilaterally chose to present the "Elroy and Darryl" version, of which Rault had no conscious awareness.

## State Post-Conviction Proceedings

Rault advanced these claims in his state post-conviction proceedings filed in October 1984, and an evidentiary hearing was held respecting them in March 1985. Testimony was heard from Carol Rault (Rault's former wife), Fulgham, Bachemin, Gaudin, Rault, and Dr. Steck. Following the conclusion of the testimony, the court, on March 29, pronounced the following findings: [12]

"In the light of the United States Supreme Court decision in the case of Strickland, et al, versus Washington, and having heard all the evidence, the court makes the following findings of fact: 1) The petitioner was not denied the right to participate in his defense. 2) Petitioner was not denied the right to testify in his own behalf. 3) Petitioner's counsel were reasonably effective in their assistance of petitioner, both in the trial on the merits and during the sentencing hearing. 4) Petitioner has failed to show that he was prejudiced by any act or omission on the part of his counsel."

Fulgham's testimony at the post-conviction hearing outlined the "Good Samaritan" story (*see* note 11, *supra*) and the "Masked Men" story.[13] He testified that after Rault related the "Masked Men" story to him, he "on a couple of occasions" discussed the case "at length" with certain police officers and was able to ascertain that this was the story Rault had related to the police. He then commenced to investigate it. As a part of the story, Rault had related "that the men had forced him to go to a drugstore and to a gas station and pick up gas and a gas can." Fulgham located the clerk who sold Rault the gas can and ascertained there was no one else with him, and, from what she said, "it was obvious there was not any ... anybody else involved." Fulgham also learned what the U.N.O. students were saying concerning their observations

---

didn't want to leave the gun there because he was fearful that some kids or something might pick it up. So, he buried the gun and couldn't complete the suicide and he began running and that was about when the police came upon him."

Fulgham also explained that in the "Good Samaritan" story Rault recounted the following as occurring after he and the victim had left U.N.O. and before he initially drove off the road to the place where he took the victim out of the car:

"[Rault said] [h]e had driven past a grocey [*sic*] store, or a drugstore on Elysian Fields Avenue, ... the owners were friends of Janie Francioni's. They were going to stop in there to get help. The store was closed but they had run into a lady that was outside the store, and Sterling had said, you know, I have got this—this very sick lady, I need help, call an ambulance. We are heading towards the nearest hospital. Call the hospital, tell them I am on the way, get emergency assistance for us."

**12.** The hearing commenced March 11; following testimony on that day, it was recessed until March 15 at the request of Rault's counsel, Doskey; following testimony on March 15, it was again recessed at Doskey's request until March

29, when it concluded. Rault and his counsel were each personally present throughout. Carol Rault and then Fulgham testified on March 11; Bachemin, Gaudin, and Rault, in that order, on March 15; and Dr. Steck on March 29. Some of the tapes of Rault under hypnosis were introduced by Rault. No evidence was excluded.

Carol Rault was divorced from Rault in February 1985.

**13.** Fulgham described the "Masked Men" story as follows:

"He said he was—that Miss Francioni had given him a ride to U.N.O. where he was going to study for a C.P.A., some C.P.A. matters; that—that at U.N.O. a couple of masked men got in the vehicle with them, that they made Sterling lie down in the back seat; they—they drove them around for awhile; that he couldn't see very much of what went on, but he was looking around out of the back seat as much as he could; that they beat Francioni up; that they—they stabbed her, they shot her, and that he ran away, he was able to get away and—and ran to the—the bridge where he hid until he saw the lights from the squad cars and then he came forward."

of Rault and the victim, and felt that this was inconsistent with the "Masked Men" story. Asked whether Rault's switch from the "Masked Men" to the "Good Samaritan" story was "essentially a long transition," Fulgham replied, "It took sometime, yes." He testified that from time to time he confronted Rault with the results of his investigations and

> "ask[ed] him questions as to how he would explain such and such actions. I also spoke with members of the family, his wife and they told him that they didn't believe that—that he was telling all the facts involved and that he should be truthful, and then subsequently he told what you phase—phrase as the good Samaritan story." [14]

Fulgham related that the "Good Samaritan" story "was drawn out" with "varying details" over several lengthy interviews with Rault after the latter had finally agreed to tell exactly what happened.

The testimony revealed that the "Elroy and Darryl" story came about in the following manner. Fulgham had hired investigators Bachemin and Schnapp to assist in the defense. It was verified—just when is unclear—that Rault had called his wife on the night of March 1. An attempt was made to check out the "Good Samaritan" story. It was determined that the victim had some involvement—whether culpable or not could not be determined—in the em-

bezzlement; the gun could not be located; in general, the investigation was wholly fruitless. Bachemin tried to locate the woman at the Elysian Fields Avenue store to whom Rault supposedly gave the money to call for emergency assistance. This proved unsuccessful. In discussions with Carol Rault, Bachemin learned that Rault had in years past frequently been hypnotized by his cousin Elroy, who subsequently, in 1975, committed suicide.[15] Bachemin, who had substantial experience with hypnosis, concluded that if hypnotized Rault might be better able to recall the woman in question and where he met her, and thus enable her to be located. He reported this to Fulgham, who approved the procedure, as also did Rault. Bachemin then, on June 2, hypnotized Rault, with the latter's prior consent, and Rault told the "Elroy and Darryl" story. The session was taped. Although most people recall what they do or say during hypnosis, Bachemin felt sure Rault did not; he did not tell Rault what Rault had said during the session, and Rault did not ask him.

Bachemin took the tape to Fulgham and they listened to it. Fulgham was impressed with its apparent "authenticity," with Rault's speaking in different voices as Elroy and Darryl. He determined "that it would be important for a professional person to listen to the tape and form an opinion ... of Mr. Rault's sanity." Dr. Steck, a

**14.** Rault admitted that he did not tell Fulgham the "Good Samaritan" story until about two months after he initially met with him. He said he did not trust Fulgham, thinking he might be with the prosecutor's office, until he received a letter from his wife telling him to be honest with Fulgham. Rault claimed the "Masked Men" story was suggested to him by the police and that he so advised Fulgham when he switched to the "Good Samaritan" version. Fulgham denied ever being told that the "Masked Men" story originated with or was suggested by the police. Gaudin testified that when she came on the case—apparently in late April— Rault was still telling the "Masked Men" story.

**15.** Carol Rault's testimony at trial confirmed that Elroy had frequently hypnotized Rault; while Rault was in the hypnotic trance, Elroy would ask Rault to contact their deceased cousin, Darryl, who had died in 1969; the hypnotized Rault would then, after some moments of

silence, report to Elroy what Darryl had said; Elroy, however, wanted to communicate directly with Darryl, and on some occasions Darryl "took possession of" Rault's body, so that Darryl talked directly from Rault's mouth to Elroy; while Rault was in a trance during such a "session" with Elroy, Rault's "Grandma Ritter," likewise then deceased, warned Rault "against allowing Darryl to take possession of his body." Rault had no recollection of what was said during these sessions. After Elroy's death, Rault was very despondent; he also had frequent nightmares, and when woken by his wife often told her Elroy had been chasing him. Rault's testimony at the post-conviction hearing confirmed that he had been hypnotized by his cousin Elroy.

Fulgham asked Elroy's widow, Connie, to help in the defense, but she refused to cooperate.

psychiatrist with experience in hypnosis, was retained.[16] He listened to the tape, and subsequently had two-and-a-half hour sessions with Rault on August 6, August 13, and September 8. On at least two of these occasions he hypnotized Rault. Fulgham was present during these sessions, and they were taped. Dr. Steck also interviewed Carol Rault and Rault's parents. In all the hypnotic sessions, Rault repeated the "Elroy and Darryl" version without material variation. At the trial, Dr. Steck recounted the "Elroy and Darryl" story which Rault had related to him while under hypnosis.[17]

16. Dr. Steck graduated from medical school in 1955. Following internship and subsequent service as a flight surgeon in the Air Force, he completed a three-year residency in psychiatry at Tulane in 1962 and then served two years as a hospital staff psychiatrist. Thereafter, he engaged in the practice of psychiatry, as well as serving as an assistant professor of psychiatry at L.S.U. Medical School. He had been extensively using hypnosis in his psychiatric practice since 1968. He was not "board certified" as a psychiatrist, but this did not limit his ability to practice psychiatry, and he was "on the staff as a psychiatrist" at several local hospitals, and was a member of the American Psychiatric Association, the local and state medical societies, and similar organizations.

17. Relevant portions of Dr. Steck's trial testimony in this respect are as follows:

"He and Janie spoke and they talked about the money. There was some discussion about whether it should be returned or not. During that afternoon, he described her giving him a tablet.... He told me that during that afternoon, Elroy appeared to him in the room. He saw Elroy. Elroy was the friend of his who was dead, it's an halluciantion [sic]. Also at the time he was seeing Elroy, he also tells me that he had sexual relations with a young lady by the name of Janie. He indicates that the hallucinated Elroy encouraged the sexual relationship.

"....

"This was in the office, yes. sir....

"....

"I was convinced that he believed that he saw Elroy.

".... .

"He left the office in the car with Janie and they drove to the U.N.O. parking lot. While there, they had a discussion about the money. He wanted to return the money, and she didn't. She pulled a gun, there was a scuffle for the revolver, and the revolver went off.

"....

"She got shot.

"....

"During the struggle, he called her [Janie] Connie. He's talking about this as though it's a here and now experience. He called her Connie.... Later on I found out that Connie is the wife of Elroy.

"....

"... I didn't find that out during the trance, I didn't know who Connie was at the time.

The point is he confused her, he confused her and thought that perhaps he wasn't with Janie, he was with Connie. I don't think at that time he knew who he was or where he was or what was going on.

"....

"... [H]e left U.N.O., there's some scuffling, Janie leaving the car, going back to the car, and meeting one or two people. And he had said that somebody had asked him to please call an ambulance. Then there was some scuffling with getting her back in the car. They drove somewhere else. They stopped at a shopping center to go to the telephone and call for help. While he was there trying to get into a store to call for help, a woman appeared. He asked this woman to help him find an ambulance, and then he said this woman was Grandma Ritter. Grandma Ritter is someone who has been dead for quite some period of time.... That was an hallucination.

"....

"... I believe he had this hallucination and he saw this figure, yes.

"....

"Well, he felt that he was trying to—that she was shot and dying, and he felt that he was trying to save her.

"....

"... I believe he told me that when the bullets went off, he felt that three shots were fired. I'm not quite sure, maybe he said two. I know that later on he also said that at the time he saw or was hallucinating Grandma Ritter in the parking lot, another shot was fired.

"....

"He had stopped the car by this grassy area and Janie was on the ground and he was attempting to resuscitate her, he was attempting to help her breathe. He told me he performed a maneuver to squeeze her chest to help her breathe. It was at this time that the two hallucinated figures appeared, Elroy and Darryl. They appeared and they were attempting to kill her. They were maiming her; they were beating her. It was Sterling who went to get a pen knife to do a tracheotomy so that she could breathe, but it was the hallucianted [sic] figure of Elroy that took the knife and cut her throat. It was the hallucinated Elroy and the hallucinated Darryl who set her afire.

There were several difficulties with the "Good Samaritan" story. It did not explain the evidence of sexual intercourse. The second gunshot wound—which would lead to death in five to ten minutes—was not consistent with the half hour or more of events involving the victim following departure from U.N.O. The slashing of the victim's throat as a tracheotomy and her cremation would not be believable. On the other hand, following consultations with Dr. Steck, Fulgham and Gaudin concluded that an insanity defense could be grounded in Dr. Steck's testimony based in substantial part on the hypnotized interviews of Rault. This would also provide a basis for mitigating circumstances in the event of a finding of guilty. See LSA–C.Cr.P. art. 905.5(b) and (e) (mitigating circumstances include commission of offense "under the influence of extreme mental or emotional disturbance" or while offender's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law is impaired as a result of mental disease or defect).

Dr. Steck, indeed, testified at trial that "[t]he total events indicated to me that this is a man who is becoming insane. I think he's relating to us parts of his insanity." He gave his opinion that Rault "was experiencing psychotic states" on March 1 and "I don't think at that time he knew who he was or where he was or what was going on." Dr. Steck testified that in his opinion Rault was in a profound self-induced hypnotic trance during the events of March 1. When asked, "could he know what was right and what was wrong," Dr. Steck replied, "I don't believe. I believe when he gets in those states he doesn't know the difference between right from wrong." Dr. Steck stated that Rault was one of about ten percent of the population who could go into especially profound trances, not recalling anything that happened, and "I think if he's examined by a psychiatrist without going into a trance, I think the psychiatrist would find him not mentally ill." The prosecution medical witnesses, who testified to Rault's sanity, did not observe him in a trance or under hypnosis. The trial judge charged the jury on the guilt phase of the trial to acquit Rault if they found him insane at the time of the offense, and in the sentencing phase of the trial charged the jury, inter alia, on the statutory mitigating circumstances and that they could consider the evidence at the guilt phase as well as that at the sentencing phase.

Fulgham and Gaudin, in consultation with Dr. Steck, determined that the best strategy was to have Rault testify, unhypnotized and then while under hypnosis by Dr. Steck, so as to vividly demonstrate the contrast in Rault's manner and to present, along with the tapes of the hypnotic sessions, a convincing predicate for Dr. Steck's testimony. On September 30, Fulgham filed a motion to allow Rault to give testimony under hypnosis by Dr. Steck as demonstrative evidence of his mental condition and as a predicate for evaluating the basis of Dr. Steck's testimony. After a hearing on the morning of trial, the trial court denied this motion, and likewise ruled that the hypnotic tapes could not be introduced. Fulgham immediately sought review by supervisory writs in the Louisiana Supreme Court, which denied that relief, without opinion, the same day.[18] The trial

"....

"... [H]e said that she was choking and he took a belt and put it around her neck in order to help her breathe in some way. He also said that later on, the hallucinated Elroy was dragging her about by the belt, choking her.

"....

"... He and Elroy used to communicate with telepathy. They both went into trance states and attempted to communicate with each other. He also had the idea that when you died, we're trapped in our bodies until the body deteriorates. So the kindest thing you can do for someone that you love who dies is to cremate them so you destroy their body completely and their spirit and their soul is free to go on."

Dr. Steck also testified that while under hypnosis Rault stated that he buried the gun "so that no one would be hurt by it."

18. Complaint was also made of the trial court's ruling in this respect in Rault's direct appeal. The Louisiana Supreme Court ruled that this was a matter within the discretion of the trial

court, however, allowed both Bachemin and Dr. Steck to testify as to their hypnotism of Rault and his version of the events under hypnosis, as well as allowing Dr. Steck to give his opinion, in large part based thereon, as to Rault's insanity.

In implementing this strategy, Fulgham, Gaudin, and Dr. Steck concluded that Rault should not be told what he said under hypnosis. Testimony at the March 1985 post-conviction hearing revealed that all three mutually concluded that to so inform Rault prior to trial would destroy the credibility of his hypnotized version as being something he genuinely believed as opposed to being contrived.[19]

Accordingly, Rault was not informed prior to trial of what he had related under hypnosis. Fulgham informed Rault, as Fulgham testified in the post-conviction hearing, that "what he says on the tapes indicate the basis for the insanity defense and I believed absolved him of that responsibility for the acts that occurred," and that he did not want to tell Rault what he said under hypnosis because "I wanted no possibility of any taint." Rault was made aware of the plan to have him testify both with and without hypnosis, and Rault himself stated at the post-conviction hearing that he was willing to testify under hypnosis. While, as Fulgham testified, Rault was told "no details" of his hypnotized version, the testimony at the post-conviction hearing reflects that he was given to understand that what was said would be the basis for the contention that he was insane at the time, and Fulgham "explained [to Rault] what the not guilty by reason of insanity plea was" and Rault appeared to understand "what that plea entailed." Gaudin testified in this respect:

"Q. However, was he—was he told either in your presence or were you aware of the fact that this was the theo-

ry of our defense, that we are going to put you on the stand and hypnotize you. You are going to tell a version and then we are going to contrast the version?

"A. Yes, I heard Gene discuss that with him at length.

"Q. Now—and so, he—he was aware of everything except for just what was going to be said under the hypnosis—

"A. That's correct.

"Q. —as far as you—and he as far as you could tell thought that that was the acceptable line of defense?

"A. Yes.

"Q. And as far as you could tell he was aware of the the—the approach of the insanity plea different than showing that he did not do it, but that he was not culpable?

"A. Yes, . . . ."

Fulgham informed Rault's family, including his brother and wife, of what the tapes reflected and the theory of defense to be based on them. Carol Rault testified that she listened to Rault's taped statements given under hypnosis and discussed the defense theory with Fulgham, and approved of it, believing it presented the best chance to save his life.

When the Louisiana Supreme Court denied the supervisory writs, Fulgham testified that he believed that the insanity "defense was still viable." In his opening statement to the jury at the beginning of trial, Fulgham, according to his testimony (the opening statements were not transcribed), "gave the entire version as closely as I could to what . . . his [Rault's] hypnotic state testimony was." Fulgham testified that this was the first time Rault heard the substance of what he said on the tapes, and that Rault's reaction reflected "genuine surprise."[20]

court and "it did not abuse its discretion in disallowing the tape recording and hypnosis demonstration, which were both comulative [in light of Dr. Steck's and Bachemin's testimony] and of questionable validity." 445 So.2d at 1208.

**19.** Dr. Steck was also of the view that it might be damaging to Rault psychologically.

**20.** Rault was asked at the post-conviction hearing, "[D]o you recall" Fulgham's opening statement, and replied, "Barely because it was sort of hard for me to hear him," and that the first time

The court's ruling that Rault could not be hypnotized on the stand, of which Rault was aware, made Fulgham believe that it would likely be inadvisable for Rault to testify.[21] Fulgham testified that this was for two principal reasons, viz:

"First and foremost I think is the fact that in a non-altered state his—his testimony, his—his indication of psychosis, no mental defects at all, and I felt that his mental defect was his best defense that he had, and I guess that was the most important reason. However, I—I did fear that if he took the stand and told the story that he was trying to assist Miss Francioni, that he was trying to save her life, that everything he did, the tracheotomy, the pulling her out of the car with the belt, that if he had told that story, I feared that the jury would have a back-

lash, that they would omit any possibility of believing Steck's testimony, that they would consider that—that he had no remorse for what the actions occurred and I personally believe that is not true." [22]

Fulgham ultimately came to the conclusion that for these reasons it would be best for Rault not to testify, either at the guilt/innocence phase or at the sentencing phase of the trial. Fulgham testified this was a reluctant conclusion on his part because "it's my normal course to put a defendant on the stand." Fulgham and Gaudin both testified that this was discussed with Rault several times during the trial, and that Rault accepted and appeared relieved at Fulgham's advice that he not testify, and made it apparent that he did not want to testify.[23]

he actually heard about the role of Elroy and Darryl was when he heard Dr. Steck testify.

**21.** Though Fulgham believed that, in accordance with his invariable practice, he likely asked the jury on *voir dire* (which was not fully recorded) if any would be prejudiced against Rault if he did not take the stand and told them that if Rault did not that would be Fulgham's decision, not Rault's. This was his practice because it tended to somewhat protect a defendant from adverse inferences if he did not testify, and if he did testify also worked to his advantage by giving the jury more than it had been promised.

**22.** Lastly, Fulgham was concerned that by putting Rault on the stand he might "cure" what he felt was the error committed by the prosecution in going into a previous incident in which Rault may have cut the brake lines on a co-worker's car. This is the "Boleware" incident referred to in the admission of Rault's fourth claim of error herein.

Gaudin's testimony agreed with Fulgham's as to the reasons for concluding it would not be advisable for Rault to take the stand, except that Gaudin did not mention the Boleware matter.

**23.** Fulgham's testimony included the following:
"During the trial I discussed with him several times, I think a couple of times at my own initiative, and perhaps once at his initiative as to whether or not he should take the stand. It always was a—an open discussion with him that, you know, this is some things that I see that would indicate that—that he shouldn't take the stand, and in the end, you know, without—he would agree, and in fact it almost

seemed to me like he would be relieved that he would not be taking the stand.
".....
"Told him he had the right to take the stand, that it was—he could make that decision. I said in a sense if you want to take the stand, I'll put you on the stand, and I told him that—that I had a lot of feelings that perhaps he shouldn't take the stand, but if he desired to take the stand I would certainly be comfortable with that also, that we would, we would go in that direction.
".....
"... [I]f he had ever said Gene, I want to take the stand, he would have taken the stand but it was always, you know, in our discussions, and—and he did state do you think I should take the stand at one time. As I recall that was—that was the phraseology of the question, and—and we discussed in that manner but he never said I want to take the stand, let's put me on the stand or anything like that."
Gaudin's testimony was similar:
"Q. At this point, do you remember whether or not Mr. Fulgham at any point specifically told the defendant in these words or ones that are every bit as concise, you have the absolute right to take the stand regardless of what I advise?
"A. Absolutely, I heard Gene tell him that."
She testified that Fulgham told Rault, concerning the matter of taking the stand, "[I]t's ultimately your decision Sterling." When asked what Rault's reaction was to Fulgham's advice that it would be best if Rault did not testify, she replied, "He agreed—he didn't take the stand, he didn't want to. He really didn't want to, anyway" and, "He said he was relieved."

Rault in his testimony at the March 1985 post-conviction hearing did not dispute that there were discussions during trial with Fulgham concerning his taking the stand, and indeed specifically referred to such following Dr. Steck's trial testimony. Rault testified, however, that he insisted on taking the stand to both Fulgham and Gaudin and was told he could not.[24]

Fulgham further testified that his philosophy of defense was "to have a—a defendant totally involved in the case"; that he had an excellent and close working relationship with Rault, who was extremely cooperative; that he was receptive to suggestions Rault made at trial, including the striking of jurors; and that he told Rault to write him notes or talk to Gaudin during court sessions and to visit with him during recesses so "we could go over whatever his thinking was." Gaudin testified that prior to trial Rault asked to see her alone, without Fulgham, but expressed no dissatisfaction with Fulgham and asked "whether or not he could pay any amount of money to a judge to have this go away."

**State Post-Conviction Findings Presumed Correct**

■ The March 1985 state post-conviction hearing, at which Rault was represented by counsel, was full, fair, and adequate, and Rault was allowed to make full development of the relevant facts. Indeed, there has been no suggestion that any other relevant evidence could be submitted in support of Rault's claims. To the extent that they are fairly supported by the record, the factual findings of the state court in those proceedings are presumed to be correct. This applies to implicit factual determinations and credibility choices as well as to express findings. *Armstead v. Maggio*, 720 F.2d 894 (5th Cir.1983). *See also Gaines v. Ricketts*, 554 F.2d 1346, 1347 n. 2 (5th Cir.1977).

**Claimed Denial of Right to Testify**

■ Rault was not denied the right to testify in his own behalf, and the state court post-conviction finding to this effect is amply supported. Under the credibility choices that the state court obviously made, and which are fully supported by the record, Rault was clearly told by his counsel that he had the right to testify, that the ultimate decision on whether or not he would testify was his, and that if he chose to testify his counsel would proceed on that basis, and Rault, who did not want to take the stand, elected not to do so.[25] We likewise reject the argument that Rault's right to take the stand was as a practical matter foreclosed by reason of the fact that there were inconsistencies between his hypnotized "Elroy and Darryl" version, which version he was not aware of prior to trial and which was presented by his counsel in opening statement and by the testimony of Dr. Steck, and the "Good Samaritan" story he would have testified to if he had elected to take the stand. However, this does not implicate the right to testify as such, else every decision of defense counsel, indeed every development at trial, which the defendant did not personally bless, could be viewed as a denial of the right to testify if it resulted in what the defendant wanted to testify to appearing less convincing than it otherwise would have. Moreover, and wholly apart from the foregoing, Rault's argument is simply not compelled, or even supported, by the record. To begin with,

---

**24.** Rault also testified:
"I insisted on testifying, that's correct, and was told by Mr. Fulgham, Mr. Fulgham that I could not and would not take the stand. His exact words, if I recall, right was he would not permit, he would not let me take the stand."

**25.** Accordingly, we do not reach the question of whether "the decision whether to testify is properly allocated to the defendant's attorney and not to the defendant." *See Wright v. Estelle*, 572 F.2d 1071, 1073 (5th Cir.) (en banc) (concurring opinion of Judges Thornberry, Clark, Roney, Gee, and Hill), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978).

Though Rault does not contend otherwise, we note that Fulgham's and Gaudin's advice to him that it would be best for his defense if he did not testify was unquestionably well within "the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

the testimony of Fulgham and Gaudin reflects that Rault did not want to testify anyway. On the other hand, Rault's testimony was *not* that he decided not to testify because of what Dr. Steck had testified to (or his counsel's opening statement), but rather that after Dr. Steck's testimony he *insisted* on testifying, and ended up by not doing so only because his lawyer told him that he would not and could not.[26]

**Claimed Denial of Right to Participate in Defense**

■ Insofar as Rault's claim that he was denied the right to participate in his own defense rests on the assertion that he was denied the right to testify, we reject the claim for the reasons above stated. To the extent that the claim embraces an assertion that Rault was not afforded an opportunity to have the defense advance the "Good Samaritan" story, it must also be rejected for the same reasons. So far as the "Good Samaritan" story included factual assertions not otherwise advanced at trial, there was no available evidence to support it other than Rault's own testimony; and Rault was afforded the opportunity to testify and elected not to do so.[27]

The remaining component of Rault's right to participate in his defense claim involves the assertion that his federal constitutional rights were violated because he was not told the substance of the story that he related under hypnosis which was put forward as a major predicate for his insanity defense. We likewise reject this final aspect of Rault's claim.

■ We are not cited to any authority that the decision to advance a particular defensive theory may not be made by counsel alone, but must have the informed agreement of the defendant personally. Just because a decision involves the defendant's constitutional rights does not mean that it must be made by him personally, instead of by his counsel. *Winters v. Cook*, 489 F.2d 174 (5th Cir.1973) (en banc). Judge Godbold in his dissenting opinion in *Wright v. Estelle*, 572 F.2d 1071, 1074–84 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978), asserted the view that the decision whether or not to testify must be committed to the defendant personally, and not simply to his counsel. But, as Judge Godbold recognized, "the great bulk of decisions made at trial" are ones which may be characterized as "trial strategy and can be made by counsel without the knowledge or consent of defendant." 572 F.2d at 1077.[28] Moreover, here Rault personally agreed to be

26. At another point in his testimony, Rault also claimed that Fulgham and Gaudin told him that if he did not do as they said they would quit and he could not get another lawyer.

27. We further observe that while Rault's testifying to the "Good Samaritan" story would almost certainly have been harmful to the insanity defense, and to pleas of mitigation to avoid the death sentence, for the very reasons stated in the above-quoted portions of Fulgham's testimony in this connection (*see* text at n. 22, *supra*), nevertheless Dr. Steck's testimony concerning Rault's relation to him under hypnosis of the "Elroy and Darryl" story, which was not admitted for the truth of the matter stated, did not have the probable effect of significantly harming whatever meager defensive potential the "Good Samaritan" story may have had if Rault had testified to it. The "Good Samaritan" story and the "Elroy and Darryl" story were remarkably consistent, particularly on the theory that the shooting was accidental, a result of the struggle when the victim pulled the gun on Rault because she was upset over his insistence on returning the embezzled funds. One point of divergence was that under the "Good Samaritan" version Rault denied any sexual intercourse with the victim. However, sexual intercourse was convincingly established at trial, and that admitted in the "Elroy and Darryl" version was consensual intercourse in the office earlier in the afternoon (which was consistent with the scientific evidence). The other main point of divergence related to the throat cutting and burning, which Rault himself did in the "Good Samaritan" version but for which the deceased cousins were responsible in the "Elroy and Darryl" version. These events, however, occurred after the victim had died, as established by the uncontradicted direct testimony of the pathologist called by the State.

28. *Cf. Berry v. King*, 765 F.2d 451, 454 (5th Cir.1985) (stipulation made by counsel without defendant's consent not improper where it was not "the functional equivalent of a plea of guilty" since it did not admit one necessary element of the offense, namely, specific intent).

hypnotized, he was informed that what he said under hypnosis indicated the basis for an insanity plea, and that plea was explained to him. He personally agreed to the plea of not guilty and not guilty by reason of insanity, and to testify under hypnosis. He knew he did not know what he had said under hypnosis. He also knew that what he said under hypnosis indicated a basis for an insanity defense that was not reflected by his conscious version of the events, and that the plan was to contrast these two versions. He knew that his lawyers felt that to tell him what he said under hypnosis would risk a taint of the hypnotized version and lessen its credibility. He consented to this strategy. If Rault had a constitutional right to some personal participation in the decision to advance the insanity defense, the extent to which he did in fact personally participate met any constitutional requirement in that regard.

We observe in this connection that Rault's counsel determined not to tell him what he said under hypnosis not only in complete good faith and undivided loyalty to their client, but also as a carefully considered decision of trial strategy, arrived at after consultation with Dr. Steck. Rault's family was fully informed of the content of the tapes and consulted. We have already related Rault's knowledge and participation. We cannot say that the decision not to disclose the contents of the tapes to Rault, or the decision to advance the insanity plea, came even close to being without "the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). Taken in overall context, counsel's performance in these and other respects was clearly well within the broad perimeters of "reasonableness under prevailing professional norms," *id.* 104 S.Ct. at 2065, and certainly did not "so

undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 2064.

**Conclusion**

Rault has made no substantial showing of the denial of a federal right with respect to his claims of denial of the right to participate in his defense and denial of the right to testify, whether considered jointly or separately and whether evaluated as asserted denials of the right to effective counsel, or independently thereof, or as a combination of independent rights and the right to counsel. Rault's first and second claims do not justify our granting of a certificate of probable cause.

### DENIAL OF RIGHT TO CROSS–SECTIONAL JURY

■ Rault's third claim is that the exclusion of potential jurors who were excludable under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) because of their inability to consider imposition of the death penalty, denied him the right to a cross-sectional jury at the guilt stage of the trial and subjected him to a panel unfairly biased in favor of the prosecution, all as held in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985), *petition for cert. filed sub nom. Lockhart v. McCree,* 53 U.S.L.W. 3870 (U.S. May 29, 1985) (No. 84–1865).

This theory has repeatedly been rejected by this Court and has been held not to justify our granting of a certificate of probable cause. *Watson v. Blackburn,* 756 F.2d 1055, 1056–57 (5th Cir.1985); *Knighton v. Maggio,* 740 F.2d 1344, 1346, 1351 (5th Cir.), *petition for stay of execution and petition for writ of certiorari denied,* —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984).[29]

29. We also observe that this claim was raised for the first time in the May 1985 application to the Louisiana Supreme Court for habeas corpus, which was denied without opinion. While Rault's counsel objected at trial to exclusion of jurors under *Witherspoon,* this objection was grounded on the theory that the State did not

have a legitimate capital case, since (as stated in the defense's "Motion to Limit Voire Dire") "reliance on embezzlement as a motive for first degree murder is not sufficient to establish the offense of first degree murder, yet the State will be allowed to proceed as if this evidence were sufficient to establish the offense." Even as-

Accordingly, this claim does not warrant our issuance of a certificate of probable cause.

## EVIDENCE OF OTHER CRIMES

■ Although in the statement of the issues in his brief in this Court Rault characterizes his fourth complaint as being that "the state was allowed to present opinion evidence of defendant's responsibility for other crimes," in the argument section of the brief, as well as in the supporting memorandum filed in the court below, Rault makes plain that this complaint relates only to evidence of one other crime and does not involve "opinion" evidence as such. Rault's brief frames his complaint in this respect as follows (his memorandum in the court below is essentially the same):

> "Petitioner does not assert that the state cannot introduce evidence of other crimes at a sentencing hearing. However, petitioner asserts that the state violated his right to due process when it introduced testimony concerning a crime for which it had nowhere near proof beyond a reasonable doubt, even if its evidence were uncontroverted."

Rault's brief (as well as the memorandum below) makes it plain that this complaint is directed only to evidence of Rault's involvement in the 1981 incident in which the brake lines on the vehicle of a fellow employee were cut.

The opinion of the Louisiana Supreme Court fairly sets out the evidence on this matter as follows:

"The state, during the sentencing phase, offered testimony linking Rault with embezzlement of the Masonite Corporation, his former Mississippi employer and with a possible attempted murder of a fellow Masonite employee, Ted Boleware. Two witnesses testified that Rault admitted embezzling the money. The Masonite attorney said that Rault executed a $118,846.97 promissory note in favor of the company in restitution. In return, Masonite agreed to forego criminal prosecution provided Rault left the company. Documentary evidence substantiated the testimony.

"Ted Boleware testified that Rault came to him after his dismissal and admitted he had taken more money than had been discovered. Rault gave Boleware a $47,000 check drawn on Masonite and asked him to void it and to keep silent about its existence. Several months later, Rault began telephoning Boleware and succeeded in getting Boleware to come to his home. Rault invited the Boleware family to return to his home for dinner, but Boleware declined because they were attending church that evening. Rault asked several questions concerning the church's location and service times. When the Boleware family left church that evening, their car malfunctioned. The brakelines had been cut. A crime against property report was filed concerning the incident but no arrests were made. Detective Bush testified that the brakelines had been deliberately sawed in half." 445 So.2d at 1214.

---

suming this character of objection were sufficient to raise the *Grigsby* point, nevertheless no complaint was made on direct appeal in respect to any aspect of the *voire dire,* or to the exclusion of any potential juror, or to the composition of the panel (nor were any of these matters raised in the Louisiana trial court post-conviction proceedings). At the time of trial, in October 1982, nearly two years had passed since the Eighth Circuit's holding in *Grigsby v. Mabry,* 637 F.2d 525 (8th Cir.1980) that claims of this kind warranted an evidentiary hearing. There would thus not seem to be adequate "cause," under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982),

for the failure to earlier raise the claim. Louisiana law requires claims of this nature to be raised at trial and on direct appeal. *See* LSA–C. Cr.P. arts. 841, 844; *State v. Spencer,* 446 So.2d 1197, 1200 (La.1984); *State v. Webb,* 419 So.2d 436, 438 n. 2 (La.1982); *State v. Mitchell,* 356 So.2d 974, 976 n. 1, 981–82 (La.), *cert. denied,* 439 U.S. 926, 99 S.Ct. 310, 58 L.Ed.2d 319 (1978). The fact that on the only occasion this claim was raised in the Louisiana courts—in the 1985 application for habeas corpus to the Louisiana Supreme Court—it was denied without opinion, does not mean that the Louisiana court did not apply a procedural bar. *See Rollins v. Maggio,* 711 F.2d 592 (5th Cir.1983); *Stokes v. Procunier,* 744 F.2d 475, 480 (5th Cir.1984).

The Louisiana Supreme Court also pointed out:

"Dr. Charles Steck testified [during the guilt determination phase of the trial] for the defense and was recognized by the court as an expert in the fields of psychiatry and hypnosis. Steck interviewed Rault on three separate occasions and hypnotized him at least twice. During the course of the direct examination of this witness, the following testimony was adduced:

"'Q. Did he ever have any prior occasion, while he was under a hypnotic trance, did he ever tell you about any prior occasions where Elroy had appeared and done something to some other individual, a Ted Boleware, does that name ring a bell with you?

"'A. I don't recall the name, but he did tell me that he was involved in an embezzlement in Laurel, Mississippi, and that somebody, I don't recall the name, didn't return the money and he was angry with him, the person who didn't return the money, and he told me that Elroy cut the man's brake lines. So, in my opinion, it was probably, I think that

it was Sterling Rault that cut the man's brake lines.'" 445 So.2d at 1214 n. 7.[30]

The Louisiana Supreme Court further observed that under LSA–C.Cr.P. 905.2[31] the defendant's character is a legitimate issue at the sentencing phase of the case and, as the jury was instructed here, evidence introduced at the guilt determination phase may be considered at the sentencing phase. 445 So.2d at 1215, 1216.

As indicated, Rault does not claim that the State may not prove at the sentencing phase that he committed other crimes, including those for which he had not been convicted.[32] Rather, Rault's claim is that the evidence of his involvement in the brake line cutting incident was too tenuous and speculative. He relies on the statement in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2748 n. 24, 77 L.Ed.2d 235 (1983), that

"[w]e need not decide in this case whether the death sentence would be impaired in other circumstances, for example, if the jury's finding of an aggravating circumstance relied on materially inaccurate or misleading information."[33]

---

**30.** Evidence at the post-conviction hearing established that Rault made these statements to Dr. Steck while under hypnosis. Fulgham was present when the statements were made. Fulgham had interviewed Boleware prior to trial, but Boleware had not recounted the brake line cutting incident to him; however, Fulgham learned about the brake line incident prior to trial from another source or sources (possibly the hypnosis). Fulgham, according to his testimony at the state post-conviction hearing, understood from Dr. Steck that this incident formed a part of the basis for Dr. Steck's view that Rault was becoming insane and would go into genuine trances during which he did not know right from wrong. Fulgham did not consider that Dr. Steck's testimony would properly "open the door" to testimony by Boleware since Dr. Steck's testimony as to what Rault said under hypnosis was not introduced for its truth but merely as it bore on Dr. Steck's evaluation of Rault's state of mind. Carol Rault talked with Fulgham about the Boleware incident prior to trial; she was aware of no witness who could have disputed the incident.

**31.** LSA–C.Cr.P. 905.2 provides in part: "The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender.... The jury may consid-

er any evidence offered at the trial on the issue of guilt."

**32.** Indeed, we have held that evidence of other unadjudicated offenses committed by the accused may be admitted at the sentencing phase of a capital case. *Milton v. Procunier*, 744 F.2d 1091, 1097 (5th Cir.1984). *See also Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 3433, 77 L.Ed.2d 1134 (1983) (concurring opinion of Justice Stevens, joined by Justice Powell):

"[T]he Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating circumstances or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime."

Nor does Rault claim that the evidence in question so surprised his counsel that they were unprepared to meet it. The record would belie any such claim. *See* note 30, *supra*.

**33.** Rault also relies on *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). But, there the error was that "the death sentence was imposed, at least in part, on the basis of information which he [the defendant] had no opportunity to deny or explain." *Id.* 97 S.Ct. at 1207. Nothing like that is the case here.

We reject this contention. To begin with, we do not believe that the evidence of Rault's involvement in the brake line cutting incident can be characterized as either inaccurate or misleading. Moreover, while the evidence, apart from Rault's statements to Dr. Steck, was circumstantial, it was by no means purely speculative or tenuous. Nor can we regard it as even arguably unfair for the State to go into this incident, when the defense had raised it as an evidence of Rault's mental condition, a factor which was relevant to sentencing. *See* LSA–C.Cr.P. 905.5(b) & (e). The State's evidence concerning the Boleware incident tended to show its premeditated, carefully thought out character, and thus arguably tended to rebut the defense suggestion of wrongdoing committed only while in a hypnotic trance and under the influence of the hallucinated Elroy.

Moreover, we have held that "the erroneous admission of prejudicial testimony does not justify habeas corpus relief unless it is 'material in the sense of a crucial, critical, highly significant factor.'" *Milton v. Procunier*, 744 F.2d 1091, 1097 (5th Cir.1984). The Louisiana Supreme Court considered that the testimony in question was not materially harmful. 445 So.2d at 1216. We agree. In the first place, the defense testimony had already clearly indicated Rault's involvement.[34] Further, the jury was submitted only four possible aggravating circumstances. It found three of these, none of which implicated the Boleware incident.[35] However, it did not find the fourth aggravating circumstance submitted, to which the Boleware incident was assertedly relevant, namely, "the offender has a significant prior history of criminal activity." Unlike the situation hypothesized in the above quotation from footnote 24 of the opinion in *Zant v. Stephens*, none of the aggravating circumstances found could have been predicated on the Boleware incident, and the only submitted aggravating circumstance to which the Boleware incident was relevant was *not* found by the jury.

Rault's claim in this respect does not present a substantial showing of the denial of a federal right, and we decline to issue a certificate of probable cause on the basis thereof.

## CHARGE ON REASONABLE DOUBT

■ Rault's final complaint is that the charge on reasonable doubt did not sufficiently inform the jury that a reasonable doubt could arise not only from the evidence but from the *lack* of evidence. We reject this contention essentially for the reasons stated by the Louisiana Supreme Court. 445 So.2d at 1211–12. As the Louisiana Supreme Court observed, counsel were furnished a copy of the proposed charge and given an opportunity to object and to request additional instructions. The defense's single objection was sustained, as was its single request, that the jury be charged that "the burden is on the State to establish the guilt of the accused to your satisfaction by legal and competent evidence and beyond a reasonable doubt."

In at least four separate places in the charge, the jury was told that it could not convict unless it found the defendant guilty beyond a reasonable doubt. The jury was told of the presumption of innocence and that the State had the burden of proof. Nothing in the charge suggested that a reasonable doubt could not arise from the lack of evidence. The jury was instructed, "[e]ven where the evidence demonstrates a probability of guilt, yet if it does not establish guilt beyond a reasonable doubt, you must acquit the accused." The jury was also told that if it found "the evidence

---

**34.** To the extent that the prosecution's evidence tended to show a more calculating, premeditated involvement, we cannot hold its admission constitutional error.

**35.** The three found were: offender was engaged in perpetrating or attempting aggravated rape or aggravated kidnapping; the offense was committed in an especially heinous, atrocious or cruel manner; the victim was an eyewitness to a crime committed by the defendant or possessed other material evidence against him (the jury was not charged that this circumstance had to be the motive for the killing).

unsatisfactory" on any single required element, that could give rise to a reasonable doubt. It was likewise told it was to determine "which facts have not been proved," and that

"[t]he burden, therefore, is on the State to establish the guilt of the accused to your satisfaction and by legal and competent evidence beyond a reasonable doubt."

These instructions necessarily conveyed the concept that a reasonable doubt would arise in the absence of evidence sufficient to show guilt beyond a reasonable doubt. The charge as a whole correctly and adequately conveyed to the jury the requirement of proof beyond a reasonable doubt. We find Rault's contentions in this regard to be wholly insufficient to present any substantial showing of the denial of a federal right. *See Foran v. Metz,* 463 F.Supp. 1088, 1091–92 (S.D.N.Y.), *aff'd,* 603 F.2d 212 (2d Cir.), *cert. denied,* 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979).

## CONCLUSION

None of Rault's contentions presents any substantial showing of the denial of a federal right. Accordingly, we deny Rault's application for a certificate of probable cause, we dismiss his attempted appeal, and we vacate the stay of execution heretofore entered by this Court.

Application for certificate of probable cause DENIED; appeal DISMISSED; stay VACATED.