374 So.2d 508 (1979)
Daniel Morris THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 51692.
Supreme Court of Florida.
July 26, 1979.
Rehearing Denied September 24, 1979.
*509 Jack O. Johnson, Public Defender, and Lex M. Taylor and John F. Laurent, Lakeland, for appellant.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Pursuant to the provisions of section 921.141, Florida Statutes (1975), and article V, section 3(b)(1), Florida Constitution, this appeal is before us to review, inter alia, a judgment of guilt of murder in the first degree and imposition of sentence of death thereon.
On January 1, 1976, a black male wearing a blue ski mask and gloves and armed with a .22 caliber rifle broke into the home of Mr. and Mrs. Charles Anderson, located in Polk County, Florida. Mr. Anderson was shot five times by the intruder who then approached Mrs. Anderson and demanded to be told the location of the victims' money. The man stated that he was a member of the "Ski Mask Gang," a group of blacks who had committed robberies, rapes and murders in central Florida for several months. The intruder informed Mrs. Anderson that she would have to engage in sexual relations with him if she wished to be permitted to help her dying husband and, while holding Mr. Anderson's .38 pistol to her head, he performed sexual battery upon her. During commission of the battery, Mrs. Anderson was forced to put her *510 arms around the attacker and, in doing so, felt several welt-like marks on his legs. The woman was then ordered to go into the bathroom and shower, and was later tied up. The intruder ransacked the home and stole several items, including: the .38 caliber revolver, a .22 caliber rifle, a woman's wristwatch and a pocket calculator. Following the thief's flight from the scene, Mrs. Anderson freed herself and contacted the police. Mr. Anderson died of his wounds.
Subsequent to the New Year's attack, Samuel Coleman, an informant for the Florida Department of Criminal Law Enforcement (F.D.C.L.E.), visited Lee O. Martin, appellant's neighbor. When Mr. Coleman advised Martin that he wished to purchase a weapon, Martin proceeded to appellant's home and obtained a .38 caliber revolver from appellant's wife. The sale of this revolver was consummated at Martin's home. Based upon this sale and discovery that the revolver was the weapon which had been stolen from the Andersons on New Year's Day, search warrants were issued for and executed at the residences of appellant and Lee O. Martin on January 20, 1976. Pursuant to the affidavit of an F.D.C.L.E. agent, a warrant for appellant's arrest for receiving and concealing stolen property was also issued and executed on that date. The murder weapon and a medium blue ski mask were found at Lee O. Martin's residence. A black ski mask was found in appellant's home. In addition, a rifle and calculator, identified as property stolen from the Andersons' home, were seized from appellant's residence. A tackle box and two knives which had been taken from the Andersons' home during the New Year's attack were found in appellant's automobile.
Following his arrest for receiving and concealing stolen property, appellant was advised of his Miranda rights by arresting officers, and questioned. During the questioning, appellant was required to drop his trousers to permit inspection for welt-like marks on his legs. The scrutiny revealed raised scars on appellant's legs. In addition, appellant informed the officers that he was in the business of buying and selling stolen property.
On December 21, 1976, appellant was indicted for the offenses of first-degree murder, robbery, sexual battery and burglary. Thereafter, appellant filed a motion for discharge in the Circuit Court for the Tenth Judicial Circuit claiming a violation of his right to a speedy trial. The trial court denied the motion. Appellant also filed motions to dismiss the indictment, claiming that section 775.082(1), Florida Statutes (1975), was unconstitutional, and for change of venue due to extensive pretrial publicity. The court denied the first motion and reserved ruling on the second pending voir dire examination of the jury venire. Subsequent to impaneling of the jury, the court denied the motion for change of venue.
At appellant's trial, Mrs. Anderson testified, in part, that she had felt welt-like marks on her assailant's legs during the sexual battery. The victim stated that she was unable to identify appellant as the assailant because the latter was wearing a blue ski mask during commission of the crime. The jury found appellant guilty as charged and recommended imposition of the death penalty. Thomas was adjudicated guilty and sentenced to death by electrocution for first-degree murder and to three consecutive terms of life imprisonment for sexual battery, robbery and burglary.[1] *511
*512 Although appellant has argued sixteen points on appeal, we believe that only four of these issues warrant discussion. The remaining points are without merit.
First, appellant argues that the trial judge erred in denying his motion for discharge based upon an alleged violation of his right to a speedy trial. Florida Rule of Criminal Procedure 3.191(a)(1) requires that a person charged with a felony be brought to trial within 180 days of the date "when such person is taken into custody as a result of the conduct or criminal episode giving rise to the crime charged." Subsection (d)(3) of the rule provides, inter alia, for discharge of an accused if his trial is not commenced within the designated 180 days unless a time extension has been granted by the trial judge as provided by subsection (d)(2). The purported violation of rule 3.191(a)(1) is predicated upon an allegation that, on January 20, 1976, the date of appellant's arrest for receiving and concealing stolen property, he was actually "taken into custody" for the murder, robbery, sexual battery and burglary committed at the Andersons' residence on January 1, 1976. In support of this contention, appellant notes that his arresting officers compelled him to drop his trousers to permit inspection for welt-like marks on his legs. This action, it is maintained, could only be relevant to the crimes of January 1 because Mrs. Anderson informed police that she had felt such marks on her attacker's legs. In addition, appellant points out that the probable cause affidavit in support of the application for a search warrant as to his residence recited the events surrounding the robbery and murder committed against the Andersons. Appellant's arrest on January 20, 1976, followed the search of his home and automobile and discovery of property stolen from Mr. and Mrs. Anderson on New Year's day. It is posited that, although no formal arrest in connection with the New Year's incident was effected until appellant's indictment on December 21, 1976, the running of the 180-day time period under rule 3.191(a)(1) commenced upon his arrest for receiving and concealing stolen property. Because he was not brought to trial within the period mandated by subsection (a)(1) of the rule and no time extension was granted by the trial judge or exigent circumstances were shown, concludes appellant, he should have been discharged as provided by subsection (d)(3) of the rule.
We do not accept appellant's position and hold that the speedy trial time pursuant to rule 3.191(a)(1) commenced to run with respect to the crimes committed against the Andersons on December 21, 1976, when he was formally arrested for these offenses. Appellant's arrest on January 20 was for receiving and concealing stolen property and, as of that date, the speedy trial time began to run only with respect to that offense. Although it is clear that, as of January 20, 1976, law enforcement officers had "leads" tending to connect appellant with the Anderson crimes, it is not apparent from the record that these officials were possessed of sufficient evidence to arrest appellant or to seek a grand jury indictment for the offenses at that time. As set forth in the affidavit in support of the application for a search warrant with respect to appellant's home, the police were aware that the .38 caliber revolver purchased from Lee O. Martin by the informant, Samuel Coleman, was obtained from appellant's residence. The affidavit set forth the facts surrounding the murder and robbery and listed the property taken at that time, which included the revolver, in order to establish the origin of the weapon and thereby identify it as stolen property.
*513 The fact that the revolver was obtained from appellant's house did establish a link between him and the Anderson incident. However, prior to the sale of the .38 caliber revolver, Coleman, Martin and appellant had negotiated concerning other revolvers which the informant ultimately decided not to purchase. In addition, Coleman and Martin had conducted prior dealings with respect to the possible purchase of weapons and Coleman had observed television sets, stereos, rods and reels, and other property in a bedroom in Martin's home. In light of Coleman's prior dealings with Martin and appellant, Martin's sale of a stolen weapon which was obtained from appellant's residence, and their possession of goods under circumstances which strongly suggested that the items had been stolen, it was reasonable at that time for police to believe that appellant was a dealer in stolen goods and had merely purchased the revolver from the ski-masked bandit, and to seek a warrant enabling them to search his home for more of the items which had been stolen from the Andersons. This search might reasonably have been believed to aid in apprehension of the true criminal. Contrary to appellant's assertion, the affidavit in question does not establish that he was, in reality, taken into custody for the murder, rape and robbery committed against the Andersons; it merely indicated the origin of the .38 caliber revolver, and the connection of appellant and Lee O. Martin to the weapon. The inspection of appellant's legs for welt-like marks subsequent to his arrest for receiving and concealing stolen property does not alter our conclusion. This action of the law enforcement officers reflected a continuing and diligent effort to discover the identity of the ski-masked bandit who invaded the Andersons' residence and to determine the nature of appellant's involvement in this incident. Conceding that the spirit of the Speedy Trial Rule would not condone the withholding of some charges and an arrest on others so as to effectively extend the time periods of the rule where there is ample evidence to support probable cause as to all charges, nevertheless the record in this cause does not establish such an abuse.
In his second point on appeal, appellant maintains that the evidence introduced at trial failed to identify him as the ski-masked intruder. Rather, the evidence purportedly shows that Lee O. Martin was the perpetrator of the crimes against Mr. and Mrs. Anderson. In support of this proposition appellant notes that (1) although a sperm sample was obtained from the vagina of Mrs. Anderson following her attack, the State failed to introduce evidence that an acid phosphate test was conducted, the results of which might have excluded appellant as a possible attacker; (2) an expert testified that a negroid pubic hair, recovered from the shower where Mrs. Anderson was forced to wash following the sexual battery, could not have been that of appellant; and (3) a medium blue ski-mask, allegedly the color of that worn by the intruder, and the murder weapon were found in the home of Lee O. Martin. The ski mask found in appellant's home was black. Consequently, concludes appellant, the verdict of guilty was contrary to the weight and sufficiency of the evidence.
It is clear that the proof of appellant's guilt was wholly circumstantial. Due to the mask which was worn by the attacker, Mrs. Anderson was unable to positively identify appellant as the assailant. Mr. Anderson, the only other individual who might have identified the intruder, was murdered. It is well-established that where the only proof of guilt is circumstantial, a conviction cannot he sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla. 1956); Mayo v. State, 71 So.2d 899 (Fla. 1954); Head v. State, 62 So.2d 41 (Fla. 1952). A careful review of the record persuades us that the evidence introduced at appellant's trial was sufficient to sustain his conviction.
We decline to speculate with respect to the possible results of an acid-phosphate test and its bearing on appellant's innocence or guilt. There is an absence of evidence that this test was performed and *514 that, if conducted, its results were exculpatory as to appellant. We will not consider this issue on appeal due to appellant's failure to present it in the trial court below. See Ashford v. State, 274 So.2d 517 (Fla. 1973); Suiero v. State, 248 So.2d 219 (Fla. 4th DCA 1971); Padron v. State, 153 So.2d 745 (Fla. 3d DCA 1963). Appellant could have determined whether the acid-phosphate test was conducted and the results thereof through appropriate pretrial discovery proceedings and presented the evidence to the jury had he believed that it would tend to establish his innocence. The expert witness's testimony that the negroid pubic hair recovered from the Andersons' shower could not have been that of appellant should be considered in light of the witness's further testimony that a hair transference could have occurred; the hair might have been transferred by another to appellant while engaging in sexual relations prior to the attack on Mrs. Anderson, with a subsequent transfer of that hair to Mrs. Anderson during the sexual battery. The jury was free to accept this theory, as it apparently chose to do. See Davis v. State, 138 Fla. 798, 190 So. 259 (1939); Abbott v. State, 334 So.2d 642 (Fla. 3d DCA 1976). As pointed out by appellant, a medium blue ski mask was found in the home of Lee O. Martin, while the mask found at appellant's residence was black. In addition, the murder weapon was found during the search of Martin's home. While these facts tended to exculpate appellant, in light of the other evidence of appellant's guilt introduced at trial we cannot say that all of the evidence introduced at trial was not inconsistent with any reasonable hypothesis of innocence. Following his arrest appellant admitted to police officers that he had burglarized the Smith residence, from which the .22 caliber rifle with which Mr. Anderson was subsequently murdered was stolen. Consequently, there was evidence to link appellant as well as Lee O. Martin with possession of the murder weapon. In addition, several items of property identified as having been stolen from the Anderson home on January 1 were found in appellant's residence and automobile. Finally, Cody Martin, the brother of Lee O. Martin, testified that on New Year's night appellant stated he was going to "hit" a home. The next day, appellant informed Cody Martin that he had broken into a house and "mentioned something about having to shoot a dog." This admission connected appellant to the Anderson incident in that the Andersons' dog was shot by the masked intruder. Appellant also showed Cody Martin some property which included items stolen from the Andersons' residence.
Following his conviction for the murder of Charles Anderson appellant discovered that the leg of Lee O. Martin was scarred. This information, which was purportedly disclosed to news reporters by the wife of Lee O. Martin, apparently came to the attention of defense counsel only after it was revealed in a newspaper article. In light of Mrs. Anderson's testimony that she felt welt-like marks on her attacker's legs, appellant filed a motion for in-camera inspection of the State's files to determine whether appellee had refused to reveal this exculpatory evidence to appellant. A hearing was held with respect to appellant's motion in which Martin's wife testified that her husband had a scar located on the front of one leg "way down below the knee, almost a little above the ankle. It's real low." An agent for the F.D.C.L.E. testified that neither he nor anyone in his department, to his knowledge, had inspected the legs of Lee O. Martin for scars and that he "had no idea at all about Lee O. having any scars." The assistant state attorney who had prosecuted appellant's case stated for the record that he had not learned of the scar on Martin's leg until he was contacted by newspaper reporters in connection with the article. At the close of the hearing, the trial judge found that "the State did not fail or refuse to disclose any material exculpatory evidence in their possession to the defense."
The rule with respect to the grant of a new trial based upon prosecutorial suppression of evidence was enunciated by the United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963):

*515 [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.
Accord, State v. Crawford, 257 So.2d 898 (Fla. 1972); Green v. State, 251 So.2d 307 (Fla. 1st DCA 1971). We conclude that it was not error on the part of the trial judge, after an evidentiary hearing, to deny appellant's motion for a new trial because of the latter's failure to establish that the allegedly exculpatory evidence was in the possession of the prosecution prior to or during trial. Consequently, there was no suppression of this evidence by the State.
When the State has not been guilty of suppression of evidence but the defendant has nevertheless failed to discover its existence prior to or during trial, the grant of a new trial is governed by the standard enunciated by this Court in McVeigh v. State, 73 So.2d 694, 698 (Fla. 1954):
This court is committed to the rule that a new trial will not be granted for newly discovered evidence unless such evidence was discovered after the former trial, that due diligence must have been shown to have it at the former trial, that it must be material to the issue, it must go to the merits of the case, it must not be cumulative and it must be such as would produce a different verdict.
Accord, Dames v. State, 314 So.2d 171 (Fla. 3d DCA 1975); O'Bryan v. State, 300 So.2d 323 (Fla. 1st DCA 1974). The trial court properly refused to grant appellant a new trial on this ground as well. It is clear that appellant has failed to meet at least one prong of the aforementioned test; he has failed to establish that the newly discovered evidence would have produced a different verdict. Mrs. Anderson testified that during the sexual assault "I felt something on his legs that felt like welts." (Emphasis supplied.) Lee O. Martin's scar was located on one leg, above the ankle. Appellant, however, had scars on both, rather than only one, of his legs. In addition, appellant's scars were located on his upper thighs. Mrs. Anderson testified, in part, that she was sexually assaulted while sitting in a chair facing her attacker. It is unreasonable to suggest that while in this position, the victim placed her hand around her assailant's ankle rather than in the area of his thighs.
The third issue before us concerns appellant's assertion that the trial court erred in declining to grant his motion for change of venue from Polk County. It is maintained that a fair trial was impossible in Polk County due to extensive and prolonged pretrial publicity concerning the "Ski Mask Gang," of which appellant was a member. For the reasons hereinafter stated, we conclude that appellant's motion for change of venue was properly denied.
The standard by which a motion for change of venue based upon allegedly adverse pretrial publicity must be decided was articulated by the United States Supreme Court in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975):
The constitutional standard of fairness requires that a defendant have "a panel of impartial `indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, at 722, 81 S.Ct. 1639, 6 L.Ed.2d 751. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id., at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.
At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Ibid.
*516 The voir dire in this case does not reflect that the jurors were unable to lay aside any impressions or opinions which arose as a result of the pretrial publicity and to remain impartial. A comparison of the facts of the case before us with those in Murphy v. Florida, supra, is instructive. There, the Supreme Court noted that in determining the necessity for a change of venue:
The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality. In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

Id. at 802, 803, 95 S.Ct. at 2037.
The Court then recited its bases for upholding the trial court's denial of petitioner Murphy's motion for change of venue:
20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. [Footnote omitted.] This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

Id. at 803, 95 S.Ct. at 2038.
In the case sub judice, there are only three colloquies in the entire voir dire transcript on which appellant can base even a colorable claim that a change of venue was required. The veniremen were questioned as to their knowledge of the crimes allegedly committed by the Ski Mask Gang. In response, venireman Tatum stated:
Sir, I not only read about it, as you know an awful lot of us in Auburndale, we lived through it. And never in my life have I had to go buy bars to go on my front door and put extra chains up because my family was so frightened, not only my family but the city of Auburndale.
Despite this response, however, Mr. Tatum protested that he had formed no opinion as to appellant's guilt. Two veniremen admitted to having formed an opinion as to appellant's guilt. Even in the face of these colloquies, however, we cannot accept appellant's position. Although fifty-four of the fifty-six veniremen questioned during voir dire stated that they had heard or read about the Ski Mask Gang or the crimes committed against Mr. and Mrs. Anderson, fifty-three of these fifty-six individuals stated that they had formed no opinion with respect to appellant's guilt. The three veniremen who admitted a disqualifying prejudice hardly constitute "most [of the] veniremen" referred to in Murphy v. Florida, supra, necessary to justify drawing the protestations of impartiality by the other veniremen into question. In addition, these three persons did not serve as jurors. The court excused two of these individuals for cause and the State exercised a peremptory challenge with respect to Mr. Tatum. Consequently, there is no danger that biased persons participated in the determination of appellant's guilt or in recommendation of the death penalty.
We recognize, however, that the facts of this case are peculiar. The venire was composed of residents of Polk County. Although no actual victims of the Ski Mask Gang were prospective jurors, many residents of Polk County were in fact victimized and, as reflected by Mr. Tatum's response, some persons lived in fear of attack during this group's eighteen-month reign of terror. Had the record contained evidence that a substantial number of the veniremen had lived in fear as potential victims of the Ski Mask Gang, as did Mr. Tatum  had this been a community in terror for its safety  their representation that they could, nonetheless, serve as impartial jurors might well have been questioned by this Court. In addressing the effect of a venireman's protestation of impartiality, the United States Supreme Court stated that:

*517 Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory... .

Id. at 802, 95 S.Ct. at 2037.
However, the record of the voir dire in this case simply does not bear out the existence of a pervasive community atmosphere of fear.
Finally, appellant argues that section 775.082(1), Florida Statutes (1975), which requires a person convicted of a capital felony who is not sentenced to death, to be sentenced to life imprisonment without possibility of parole for twenty-five years, is unconstitutional. The basis of appellant's contention is that section 775.082(1) constitutes cruel and unusual punishment since it operates without regard to the circumstances of the individual defendant. The same argument advanced by appellant was rejected by this Court in McArthur v. State, 351 So.2d 972 (Fla. 1977), prohibition denied sub nom. McArthur v. Nourse, 358 So.2d 132 (Fla. 1978), vacated and remanded on other grounds sub nom. McArthur v. Nourse, 438 U.S. 902, 98 S.Ct. 3119, 57 L.Ed.2d 1145 (1978).
After a careful review of the aggravating and mitigating factors set forth in the record, we conclude that death was the appropriate penalty in this case. Facts similar to those of the case before us were presented in Gibson v. State, 351 So.2d 948 (Fla. 1977), and Adams v. State, 341 So.2d 765 (Fla. 1976), where imposition of the penalty of death was affirmed. Accordingly, for the reasons expressed, we affirm appellant's conviction and imposition of the sentence of death.
It is so ordered.
ADKINS, BOYD, OVERTON and SUNDBERG, JJ., concur.
ENGLAND, C.J., dissents.
NOTES
[1] The trial court's findings in support of the death penalty were as follows:

"As to Aggravating Circumstances in Florida Statute 921.141(5).
a.) The capital felony of Murder in the First Degree was committed by DANIEL MORRIS THOMAS while he was under sentence of imprisonment for two offenses of Robbery. He was sentenced to a concurrent ten year sentence on March 7, 1972, in Cases 72-4 and 72-5 in the Criminal Court of Record in and for Polk County, Florida. At the time of the instant offense he was on parole....
b.) The defendant was previously convicted in Polk County, Florida, on September 13, 1976, of the offenses of Burglary, Robbery, Kidnapping, Sexual Battery, two counts, and Attempt to Commit Murder in the First Degree in Case No. CF76-1105 in the Circuit Court of the Tenth Judicial Circuit of the State of Florida in and for Polk County, Florida... .
The defendant was previously convicted in Highlands County, Florida, on October 28, 1976, of the offenses of Burglary, Robbery, in the Circuit Court of the Tenth Judicial Circuit, Highlands County, Florida, Case No. CR76-170... .
The defendant was previously convicted in another case arising in Highlands County, Florida, but tried in Sarasota County on June 11, 1976, of the offenses of Burglary Without the Use of Firearm, Robbery Without the Use of a Deadly Weapon, in the Circuit Court of the Tenth Judicial Circuit, Highlands County, Florida, Case No. CR76-69... .
All of the above convictions were for felonies involving the use or threat of violence to the victims.
c.) The Court finds that the facts of this case do not support the aggravating circumstance in Florida Statute 921.141(5)(c) in that the defendant did not knowingly create a great risk of death to many persons, other than the two victims.
d.) The capital felony, the murder of Charles L. Anderson, was committed while the defendant was actively engaged in the commission of the Robbery of Charles L. Anderson and Betty Anderson, his wife, the rape of Betty Anderson and the Burglary of the home of Charles L. Anderson and Betty Anderson.
e.) This Court finds that the facts of this case do not support the aggravating circumstance in Florida Statute 921.141(5)(e) in that this capital felony was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
f.) This crime was committed by DANIEL MORRIS THOMAS for pecuniary gain in that the defendant stole several items of guns, firearms and other items of personal property all the property of Charles L. Anderson and Betty Anderson, his wife.
g.) This Court finds that the facts of this case do not support the aggravating circumstance in Florida Statute 921.141(5)(g) in that the capital offense was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
h.) This capital offense was especially heinous, atrocious and cruel. The evidence at the trial shows that the victim Charles L. Anderson was shot five times by the defendant who had broken into the home of Charles L. Anderson late at night. Further, after shooting Mr. Anderson, the defendant, DANIEL MORRIS THOMAS, sexually assaulted Mrs. Anderson by forcing her to have oral sex with him and then raping her. These acts occurred while Mr. Anderson lay inches away dying from the wounds inflicted by the defendant. The defendant would not allow Mrs. Anderson to go to the aid of her dying husband, and as soon as he completed the sex acts, he bound her, put her in the Anderson car, strapped her to the seat of the car, looted the house, drove off with the personal items from the house taking Mrs. Anderson with him, unloaded the items, returned the car and Mrs. Anderson to the Anderson residence and left. Mrs. Anderson finally broke loose, ran inside to her dead husband and dead dog, which had also been shot for no apparent reason, and called the police. The defendant, DANIEL MORRIS THOMAS, according to testimony of the victim, Betty Anderson, was entirely indifferent to the suffering he inflicted on the Andersons and apparently enjoyed it.
"As to Mitigating Circumstances in Florida Statute 921.141(6).
a.) The Court finds that the defendant, DANIEL MORRIS THOMAS, has a significant history of prior criminal activity both as a juvenile and adult and therefore rejects Florida Statute 921.141(6)(a) as a mitigating circumstance.
b.) Under Florida Statutes 921.141(6)(b) the Court finds that this capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance. The defense offered the testimony of Willie Richardson, police officer, who took an oral statement from the defendant in which the defendant stated that he was badly beaten as a juvenile by a white guard in reform school. The defendant was examined by Court appointed psychiatrist, Dr. Burt Kaplan of the Mental Health Center of Polk County, Forensic Unit, at his attorney's request, without any significant findings except that the defendant would not respond at all to the doctor's questions... .
The Court considered the above and rejects it as a mitigating circumstance under this section.
c.) The victims, Charles L. Anderson and Betty Anderson, his wife, were not participants in the defendant's acts of Burglary, Robbery, Sexual Battery and Murder in the First Degree. This Court expressly rejects this subsection, Florida Statute 921.141(6)(c), as a mitigating circumstance.
d.) The defendant acted alone in the commission of these offenses and the Court expressly rejects this subsection, Florida Statute 921.141(6)(d), as a mitigating circumstance.
e.) The defendant, DANIEL MORRIS THOMAS, did not act under extreme duress or under the domination of any other person and the Court expressly rejects Florida Statute 921.141(6)(e) as a mitigating circumstance.
f.) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired and the Court expressly rejects Florida Statute 921.141(6)(f) as a mitigating circumstance.
g.) Finally, the age of the defendant, DANIEL MORRIS THOMAS, has been considered as required by Florida Statute 921.141(6)(g). The defendant was 27 years of age at the time of these offenses. This is rejected as a mitigating circumstance.
"In conclusion, the Court finds that there are sufficient aggravating circumstances to justify the death penalty. There are no mitigating circumstances. This capital offense was committed in cold blood by a cruel and heartless killer to satisfy his desire for monetary gain, excitement and sexual pleasures in a most morbid way. It is inconceivable to the Court how one human being could inflict such inhuman treatment upon another person. The death of Charles L. Anderson was a blessing compared to the agony this defendant inflicted on Betty Anderson. These acts were but a series of similar cruel, heinous and atrocious acts inflicted on innocent people by the defendant, DANIEL MORRIS THOMAS, and justify the imposition of the most extreme penalty."