**Daniel M. THOMAS,
Petitioner-Appellant,**

v.

**Louie L. WAINWRIGHT, as Secretary,
Department of Corrections, State of
Florida, Respondent-Appellee.**

**No. 86–3244.**

United States Court of Appeals,
Eleventh Circuit.

April 14, 1986.

Douglas N. Duncan, Robert E. Alber, W. Palm Beach, Fla., Larry Helm Spalding, Capital Collateral Representative, Michael A. Mello, Steven Malone, David A. Reiser, Tallahassee, Fla., for petitioner-appellant.

Theda R. James, Ass't. Atty. Gen., Dept. of Legal Affairs, Tampa, Fla., for respondent-appellee.

Before RONEY, FAY and JOHNSON, Circuit Judges.

v.

**Louie L. WAINWRIGHT, as Secretary,
Florida Department of Corrections,
Respondent-Appellee.**

**No. 86–3244.**

United States Court of Appeals,
Eleventh Circuit.

April 15, 1986.

Douglas N. Duncan, Robert E. Alber, W. Palm Beach, Fla., Larry Helm Spalding, Michael A. Mello, Steven Malone, David A. Reiser, Tallahassee, Fla., for petitioner-appellant.

Theda R. James, Asst. Atty. Gen., Tampa, Fla., for respondent-appellee.

Before RONEY, FAY and JOHNSON, Circuit Judges.

PER CURIAM:

This is petitioner Daniel Morris Thomas' second habeas corpus appearance before this Court. Thomas was convicted and sentenced to death for the New Year's Day, 1976, murder of Charles Anderson in Polk County, Florida. He also was convicted of sexual battery, robbery, and burglary in connection with the events at the Anderson home. The facts of the case are set out in the opinion of the Florida Supreme Court affirming his conviction and sentence. *Thomas v. State*, 374 So.2d 508 (Fla.1979), *cert. denied*, 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980).[1] Thomas' motion for post-conviction relief was denied by the state court, and the Florida Supreme Court affirmed. *Thomas v. State*, 421 So.2d 160

---

1. In his brief before the Florida Supreme Court, Thomas raised 16 issues on direct appeal. Those issues are as follows: (1) whether the court erred in denying his motion to dismiss the indictment; (2) whether the court erred in denying his motion for discharge under the speedy trial rule; (3) whether the court erred in denying his motion for change of venue; (4) whether the confession of a selected juror that she was a relative of a victim of the ski mask gang entitled him to a mistrial; (5) whether testimony by State witnesses concerning two unrelated burglaries committed in a different county entitled him to a mistrial; (6) whether the trial court erred in denying his motion to suppress statements made following his arrest; (7) whether the court erred in denying his motion to suppress evidence seized from his residence; (8) whether the court erred in denying the public defender's motion to withdraw; (9) whether the court erred in denying the proffered testimony of defense witness, Don Dowdy; (10) whether the court erred in denying Thomas' motion for continuance during the penalty phase of the trial in order to obtain the testimony of Wilbert Lee; (11) whether the court erred in denying his requested jury instruction on attempted first degree murder; (12) whether the verdict is contrary to the law; (13) whether the verdict is contrary to the weight and sufficiency of the evidence; (14) whether the court erred in denying his motion for a new trial; (15) whether the court erred in sentencing the defendant to death; and (16) whether the court erred in denying a request for a pre-sentence investigation.

The Florida Supreme Court's opinion discussed the following issues: (1) the trial court erred in denying Thomas' motion for discharge under the speedy trial rule; (2) the evidence produced at trial failed to identify Thomas as the ski mask intruder; (3) the trial court erred in denying Thomas' motion for change of venue; and (4) Fla.Stat.Ann. § 775.082(1) (1975), which requires a person convicted of a capital felony who is not sentenced to death to be sentenced to life imprisonment without possibility of parole, is unconstitutional.

Thomas' first petition for certiorari to the United States Supreme Court raised these issues: (1) whether the trial court erred in denying petitioner's motion for discharge under the speedy trial rule; (2) whether the trial court erred in admitting in evidence petitioner's oral statements made at the time of his arrest; (3) whether the trial court erred in rejecting evidence that was allegedly exculpatory; (4) whether the trial court erred in refusing to grant a new trial; and (5) whether the death sentence was unconstitutionally imposed upon petitioner.

(Fla.1982).[2] The United States district court denied relief in Thomas' first federal habeas corpus proceeding, and this panel affirmed. *Thomas v. Wainwright,* 767 F.2d 738 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986).[3] No further action took place in the case until a death warrant was signed on March 11, 1986. On April 1, 1986, 14 days before the scheduled execution on April 15, a petition for writ of habeas corpus was filed with the Florida Supreme Court asserting a single issue: that the process by which jurors are selected to sit on capital trial juries is unconstitutional, alleging impropriety in the *voir dire* procedure used at trial. On April 7, the petition was denied with an opinion. *Thomas v. Wainwright,* 486 So.2d 574 (Fla.1986). Thereafter, the United States Supreme Court denied a requested stay and denied a petition for writ of certiorari. *Thomas v. Wainwright,* —— U.S. ——, 106 S.Ct. 1623, 90 L.Ed.2d 173 (1986). Counsel for Thomas immediately filed another 3.850 petiton for writ of habeas corpus in the Florida circuit court alleging seven issues.[4] That court denied relief

2. The first state motion for post-conviction relief, filed on October 6, 1982, raised seven claims: (1) the Florida death penalty statute expressly restricts consideration of mitigating circumstances; (2) the instructions to the jury during the penalty phase of the trial unconstitutionally shifted the burden of proof to Thomas; (3) the Florida death penalty statute fails to provide for fully individualized sentencing and permits unguided resentencing by the Florida Supreme Court; (4) Thomas' death sentence "shocks the conscience" as it is based on wholly circumstantial evidence; (5) Thomas' confession was involuntarily obtained; (6) the Florida death penalty statute is arbitrary and capricious as it is based on geographical differences, economic status of the defendant, sex of the defendant, and race of the victim; and (7) Thomas was deprived of reasonably effective assistance of counsel at both the guilt and penalty phase of the trial. Thomas also raised the issue of Martin's scars and fingerprints. The trial judge summarily denied the first five claims, rejected the sixth claim on its merits, and set the ineffective assistance of counsel claim for evidentiary hearing. On October 15, 1982, after hearing all the evidence, the trial court rejected the ineffective assistance of counsel claims and entered an order denying the motion for post-conviction relief.

Thomas raised three issues before the Florida Supreme Court: (1) whether defects in the present case were fundamental in nature, thus warranting an order setting aside Thomas' conviction; (2) whether Thomas was denied equal protection and due process by the resolution of his claim concerning the arbitrary application of the death penalty without first providing the expert assistance necessary for the full and fair consideration of this claim; and (3) whether Thomas was denied effective assistance of counsel. Simultaneous with this appeal, Thomas filed a petition for writ of habeas corpus in the same court alleging ineffective assistance of appellate counsel. On October 21, 1982, the Florida Supreme Court declined to stay the execution, affirmed the denial of the motion for post-

conviction relief, and denied the petition for writ of habeas corpus.

3. The petition before the United States district court raised the following issues: (1) the Florida Supreme Court received and considered non-record psychiatric reports in reviewing Thomas' case; (2) the jury was impermissibly restricted in its consideration of non-statutory mitigating circumstances; (3) the trial court's instructions to the jury during the penalty phase of the trial unconstitutionally shifted the burden of proof to the defendant; (4) the death penalty has historically been applied in a discriminatory manner; (5) Florida's death penalty statute fails to provide for fully individualized sentencing and permits unguided re-sentencing by the Florida Supreme Court; (6) the rape portion of aggravating circumstances listed in the Florida death penalty statute is so confusing and vague as to violate the right to due process; (7) the evidence presented at trial did not support imposition of the death sentence; and (8) Thomas received inadequate representation at trial and on direct appeal.

The issues presented to this Court on appeal in the first habeas corpus petition were:
(1) whether Thomas was denied effective assistance of conflict free counsel.
(2) whether Florida law at the time of his sentencing hearing discouraged his attorney from investigating and introducing evidence of nonstatutory mitigating circumstances, depriving him of either due process or effective assistance of counsel.
(3) whether the *Brown* issue as decided in *Ford v. Strickland,* 696 F.2d 804 (11th Cir.) *(en banc), cert. denied,* 464 U.S. 865, 104 S.Ct.2d, 78 L.Ed.2d 176 (1983), should be reconsidered; and
(4) whether the Florida death penalty is being administered in a racially or otherwise discriminatory manner.

4. Thomas alleged the following grounds: (1) incompetency at the time of trial; (2) the trial court restricted its consideration of mitigating

and the Florida Supreme Court affirmed on the ground that

> [a]ll of the claims in appellant's current motion are matters that should have been raised at trial and on appeal, that could have been raised on appeal but were not, that were presented on appeal and decided adversely to appellant's position, that were raised and rejected in one of appellant's previous collateral challenges, or that were inexcusably omitted from his previous rule 3.850 motion. *See Adams v. State*, [484 So.2d 1216] (Fla. 1986). We therefore find that the trial court was correct in denying the present motion without an evidentiary hearing. The record conclusively shows that appellant is not entitled to have the judgment or sentence vacated, set aside, or modified.

*Thomas v. State*, 486 So.2d 577 (Fla.1986).

Upon denial of relief by the Florida Supreme Court, Thomas filed his second federal habeas corpus petition in the federal district court at 5:23 p.m. on April 14. He raised seven issues, apparently the same ones alleged in the state circuit court and the one alleged in the petition previously addressed to the Florida Supreme Court:

(1) whether Thomas was competent to be tried;

(2) whether the trial court was unconstitutionally restricted in its consideration of mitigating circumstances;

(3) whether the trial court and jury were deprived of considering evidence in support of nonstatutory mitigating factors because of trial counsel's belief that he was limited in his investigation and presentation of mitigating circumstances;

(4) whether the State failed to disclose material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);

(5) whether Thomas was denied his right to trial by a fair and impartial jury because of (a) inflammatory pretrial publicity which saturated the community; (b) the process of death qualification and the exclusion of every juror who expressed reservations about capital punishment; and (c) the State's exclusion of black prospective jurors by peremptory challenge;

(6) whether the trial judge misinformed the jury about its responsibility for sentencing, in violation of *Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985);

(7) whether the trial judge improperly relied on Thomas' silence during pretrial psychiatric examination to find an absence of mitigating circumstances.

The district court held a hearing at 7:30 p.m. on April 14, and at approximately 9:45 p.m. entered an order dismissing the petition, denying the application for stay of execution, denying a certificate of probable cause, and dismissing the cause with prejudice.

All the papers submitted to the district court had been previously submitted to the panel members of this Court, who had an opportunity to thoroughly study them prior to the notice of appeal filed at 9:55 p.m. After further study of the materials previously submitted, and of the order of the district court, and a lengthy telephone conference, this Court, at approximately 11:20 p.m., entered an order denying certificate of probable cause and stay of execution, except to a limited extent to permit the petitioner to apply to the United States Supreme Court for a stay of execution. This opinion follows that order.

---

circumstances during the penalty phase of the trial; (3) deprivation of an impartial jury due to the racial atmosphere existing in the community; (4) the trial court diminished the jury's sense of responsibility; (5) failure to disclose the presence of welt-like marks on the legs of Lee O.

Martin and failure to disclose the presence of Martin's fingerprints on the murder weapon; (6) death-qualified jury bias in favor of the prosecution; and (7) impermissible reliance on a pretrial competency report not subject to adversarial testing.

The most troublesome issue is the allegation that Thomas was incompetent to stand trial. This Court has held that competency can not be waived or foreclosed by procedural default. *Adams v. Wainwright,* 764 F.2d 1356, 1359 (11th Cir.1985). This does not mean, however, that once the issue of competency to stand trial is raised and the state court takes the proper steps to resolve the issue, the defendant is free to drop the issue or later pick it up as it suits his purposes. In this case, the public defender's office, whose representation has withstood attack in both the state and federal courts, raised the issue of competency at trial. The state court appointed a qualified psychiatrist, and it was determined that defendant was competent to stand trial. The issue was not raised again until the latest state 3.850 proceeding and this present petition. The issue was not raised on direct appeal, the first state 3.850 proceeding, the federal habeas corpus petition, or the petition for writ of habeas corpus filed with the Florida Supreme Court on April 1, 1986. Petitioner argues two reasons to excuse prior counsel's failure to present the claim: he did not have the means to gather the information on Mr. Thomas' background, which is allegedly a prerequisite to a meaningful evaluation, or to retain experts to examine his client. The first reason is belied by the abundant amount of information which was available in the prior federal petition, as partially recited at *Thomas v. Wainwright,* 767 F.2d 738, 745–47 (11th Cir.1985). The second reason is belied by the fact that a qualified expert was indeed appointed to examine Thomas before the trial. As far as this record reveals, no other court was ever requested to appoint a psychiatrist to examine Thomas.

█ The historical facts have not changed. Present counsel have employed experts who, nine years after the fact on the eve of the scheduled execution, have concluded that Thomas was incompetent to stand trial. In our judgment, the district court correctly denied both a hearing on whether this was an abuse of the writ, and a hearing on the allegation that Thomas was incompetent to stand trial. The district court properly found that no sufficient reason is shown for the failure to raise this issue in his previous federal petition. *Witt v. Wainwright,* 755 F.2d 1396 (11th Cir. 1985).

The other issues asserted in this petition were properly handled by the trial court.

The issues concerning the court's restriction on evidence in mitigation and counsel's belief that he was restricted were fully explored in our prior opinion. 767 F.2d at 744. Contrary to petitioner's argument, *Hitchcock v. Wainwright,* 770 F.2d 1514 (11th Cir.1985) *(en banc),* and *Songer v. Wainwright,* 769 F.2d 1488 (11th Cir.1985) *(en banc),* did not change the law regarding these issues on the facts of this case.

The *Brady* argument that the State failed to disclose material evidence to petitioner is both frivolous and an abuse of the writ. The issue concerning scars on the legs of Lee O. Martin was argued on the direct appeal, 374 So.2d at 514, but never asserted to this Court. There is no indication that the matter was not properly resolved by the Florida court. The district court properly noted that since the gun was discovered in Martin's home, it would "not come as a surprise to anyone that his fingerprints were found on the weapon." There is nothing in this evidence to create a reasonable doubt that did not otherwise exist. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

The issues concerning a fair and impartial jury are meritless. This Court has previously denied a stay in a case involving the *Grigsby/Lockhart* issue with the following reasoning:

This Court is in much the position it was in in *Bowden v. Kemp,* 774 F.2d 1494 (11th Cir.1985). The Eleventh Circuit has consistently rejected the contention accepted by the Eighth Circuit in *Grigsby. Martin v. Wainwright,* 770 F.2d 918, 938 (11th Cir.1985); *Jenkins v. Wainwright,* 763 F.2d 1390, 1393 (11th Cir.1985); *Young v. Kemp,* 758 F.2d 514,

516 (11th Cir.1985); and *Smith v. Balk-com,* 660 F.2d 573, 575–84, *modified,* 671 F.2d 858 (5th Cir. Unit B 1982), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148.

We have been unable to find any case in which this Court has stayed an execution pending appeal to this Court because of the *Grigsby* issue since that issue has been settled by our decisions.

We stated in *Bowden:*

Under the precedent binding us in this Circuit, the District Judge's dismissal of the successive petition is correct and the petitions for certificate of probable cause and stay of execution are without merit. Were we to grant CPC and reach the merits of the proposed appeal on consideration of the petition for stay of execution, *see Barefoot v. Estelle,* [463 U.S. 880, 103 S.Ct. 3383] 77 L.Ed.2d 1090 (1983), we should be bound to affirm the district court. The grant of the writ of certiorari in *Grigsby* is no authority to the contrary; any implications to be drawn therefrom may be discerned by application to the Supreme Court.

774 F.2d 1494 (11th Cir.1985).

We recognize that the Supreme Court of the United States has granted a stay in some cases involving the *Grigsby* issue. *See James v. Wainwright,* —— U.S. ——, 106 S.Ct. 1393, 89 L.Ed.2d 707 *stay granted* March 18, 1986; *Adams v. Wainwright,* —— U.S. ——, 106 S.Ct. 1371, 89 L.Ed.2d 598 *stay granted* March 6, 1986; *Bowden v. Kemp,* —— U.S. ——, 106 S.Ct. 213, 88 L.Ed.2d 182 *stay granted* October 14, 1985; *Moore v. Blackburn,* 774 F.2d 97, *stay granted* October 3, 1985; *Celestine v. Blackburn,* —— U.S. ——, 106 S.Ct. 31, 87 L.Ed.2d 707 *stay granted* September 26, 1985. To our knowledge, however, in none of those cases has certiorari been granted.

To date, the law in this Circuit, which has not been modified by Supreme Court decision, mandates a denial of relief to petitioner on this issue.

*Jones v. Smith,* 786 F.2d 1011, 1011, (11th Cir.1986).

The Supreme Court likewise declined a stay in *Jones v. Smith, supra,* and has since that time vacated stays involving the *Grigsby/Lockhart* issue. *See Adams v. Wainwright,* —— U.S. ——, 106 S.Ct. 1505, 89 L.Ed.2d 906 (1986).

■ The allegation of fact concerning the excusal of black jurors by peremptory challenges of the prosecutor does not rise to the systematic recusal of black jurors required by *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). A black juror was on the jury which decided both guilt and the advisory death sentence in this case. Only the Supreme Court would know whether the pending decision in *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 306, 88 L.Ed.2d 283, could affect the settled law as to the facts here alleged.

The case for an unfair trial because of pretrial prejudicial publicity falls far short of the extreme situation required for relief under *Coleman v. Kemp,* 778 F.2d 1487 (11th Cir.1985).

Although this Court does not have before it the state trial record at this time, the allegations of the petition for writ of habeas corpus, viewed most favorably to the petitioner, reveal the correctness of the district court's decision that the record does not support the claim that the state trial judge diminished the jury's sense of responsibility for sentencing under *Caldwell v. Mississippi,* —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

■ The district court was correct in its handling of the final claim that "in determining the sentence, the State trial court impermissibly relied upon a pretrial competency report concerning the Petitioner and denied his rights under the 5th, 6th, 8th and 14th Amendments." This claim was not presented in the State courts or in this Court before and is clearly barred by the doctrine of *Wainwright v. Sykes, supra.*

This Court declines to issue a Certificate of Probable Cause.

JOHNSON, Circuit Judge, dissenting:

I would grant a stay of execution and an evidentiary hearing on petitioner's claim of incompetence to stand trial, and on his *Caldwell* and *Brady* claims. I would grant a stay of execution on petitioner's *Grigsby* claim until the Supreme Court decides *Lockhart v. McCree, cert. granted,* —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

## I. Competence to stand trial.

Thomas did not raise his competency claim in his first federal habeas petition. He argues that his competency claim is unwaivable and may not be barred on abuse of the writ grounds. Based on precedent in this Circuit, I find this argument compelling.

In *Adams v. Wainwright,* 764 F.2d 1356, 1359 (11th Cir.1985), this Court held that the procedural default rule of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) does not operate to preclude a defendant who failed to request a competency hearing at trial or pursue a claim of incompetency on direct appeal from contesting his competency to stand trial and be sentenced through post-conviction proceedings. *See also Horace v. Wainwright,* 781 F.2d 1558, 1565 (11th Cir. 1986); *accord Silverstein v. Henderson,* 706 F.2d 361, 367 (2d Cir.1983). The same reasoning which led to that conclusion supports a holding here that a defendant who failed to pursue a claim of incompetence in his first federal habeas petition may not be barred from presenting it in a second such petition on abuse of the writ grounds.

The abuse of the writ doctrine would place on the defendant's shoulders the responsibility of raising the competency issue on his first habeas petition; if the defendant does not do so, he effectively waives that claim. This conflicts directly with the Supreme Court's conclusion in *Pate v. Robinson,* 383 U.S. 375, 384, 86 S.Ct. 836, 841, 15 L.Ed.2d 815 (1966), that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." If the Court's reasoning logically extends to direct appeal, as in *Adams,* then it must also obtain in other post-conviction proceedings. Thus, a defendant may not "waive" his constitutional right to a competency hearing by his failure to raise the issue in his first habeas petition.

Although the petitioner is not barred from raising his competency claim here by his failure to advance it earlier, he is not automatically entitled to a hearing on this claim. *Adams, supra,* at 1359. Under *Pate,* only where the court has a "bona fide" doubt as to the defendant's competency must it *sua sponte* conduct a hearing on his competence to stand trial." *Pate, supra,* 383 U.S. at 385, 387, 86 S.Ct. at 842, 843. *See also Hance v. Zant,* 696 F.2d 940, 948 (11th Cir.1983), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). It is our task to satisfy ourselves that such a doubt existed. In my view, this standard was met when the court itself, after noting the defendant's persistent and unaccountable silence—and in response to defense counsel's request for a pretrial evaluation—ordered such an evaluation from a psychiatrist, Dr. Burt Kaplan. Once this doubt was acknowledged, the court was obliged under *Pate* to conduct a hearing. *Hance, supra* at 948. There is no authority to permit the judge on his own initiative, and on the unchallenged opinion of one expert, thereafter to resolve this doubt against the defendant.

But even if we were to authorize the trial judge to reconsider his initial doubt without a hearing, we would surely ask him to do so on evidence more compelling than a conclusory report based on an entirely one-sided hour-long "interview" between a psychiatrist and a defendant. It is true that the trial judge "is only required to act reasonably based on the facts before him." *Id.* at 949. But when he or she takes the initiative in securing those facts, the judge has some obligation—even under a reasonableness standard—to insure that the information that will persuade him to forego a hearing is reliable and complete. This is no

more than what we customarily expect a reviewing court to consider in assessing the factfinder's decision to disregard or to credit an expert opinion on a defendant's mental condition. *Strickland v. Francis,* 738 F.2d 1542, 1552 (11th Cir.1984).

Two factors relevant to that analysis are particularly important here:

(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;

(2) possible bias in the expert's appraisal of the defendant's condition.

*Id.* As to the first factor, it was patently unreasonable in this case for the trial judge to conclude that an expert could find a defendant competent to stand trial based on one interview—and an exceedingly brief interview, at that—in which the defendant *never spoke.* That fact alone insured that this expert opinion (termed "useless" by another psychiatrist) was based on no facts at all—and in particular, on no historical or clinical evidence. Such evidence did not require extensive investigation, but was available in welfare documents from Thomas' own hometown.

Those documents show not only an extraordinary history of abandonment, physical and emotional abuse, malnutrition, retardation and psychological trouble, but they also specifically flag Thomas' habit of silent withdrawal as a potential symptom of serious disturbance. For example, these papers indicate that as a boy, Thomas was "shy and [did] not talk freely," that he was "very quiet and withdrawn," that he spoke mostly with his brother in a made-up language that only they could understand, and that he would "clam up" when he got in trouble. In affidavits, his brothers and sisters have since indicated that that as a very young child Thomas was "slow to learn, and especially slow about talking," that he would often "go off in a trance and get inside himself," and that after his father and mother were injured in an automobile accident and a tornado hit their house, he "kind of went into himself and stopped talking to anyone." On subsequent review of these records and Thomas' behavior at trial, one distinguished psychiatrist concluded that Thomas' silence was by no means mere intransigence, but rather an easily recognizable symptom of mental illness—a "schizotypal personality disorder with psychotic-like features and paranoia."

Even if Dr. Kaplan's report were not on this ground patently inadequate, it was undoubtedly biased. A simple inquiry from the trial judge would have uncovered the fact that Kaplan had worked on the *Thomas* case before—as a kind of psychological forecaster speculating about the sort of people responsible, in his own words, for the "spree of terrorist crimes in Central Florida." (Kaplan thought that these criminals would be "hostile individuals ... with a need to exploit and control"; "marginal" persons who were probably high school drop-outs and whose behavior compared with that of motorcycle gang members.) Not only was Kaplan thus originally employed to work for the state *against* Thomas, but he also had an obvious stake in vindicating his own psychological forecast. His evaluation could hardly have been less objective.

Thomas is legally entitled to a competency hearing to determine whether, at the time of trial, he had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Hance, supra* at 948. This is a matter of crucial importance, since "[t]rial of a criminal defendant while he is mentally incompetent violates due process." *Id.* At a minimum, Thomas is entitled to an evidentiary hearing on his competency claim.

## II. *Grigsby* claim.

Thomas argues that the process of "death-qualification" for jurors in his case, and specifically the exclusion of certain death-scrupled jurors for cause or on peremptory challenges in his voir dire, produced a conviction-prone jury. The majority observes that the Supreme Court considered precisely this issue in Thomas' case only days ago and declined to stay his execution.

The majority's discussion of this claim makes its conclusion seem inevitable and certain. This is misleading. If the Supreme Court's action in *Grigsby* cases is to be our guide, then in all candor we are at this point groping in the dark.

In some *Grigsby* cases with abuse of the writ problems the Court has not stayed execution. *See Jones v. Smith,* 786 F.2d 1011 (11th Cir.1986), *stay denied,* — U.S. ——, 106 S.Ct. 1393, 89 L.Ed.2d 709 (1986). In others, stays were granted even to petitioners in procedural default or those who proffered successive petitions. *See Moore v. Blackburn,* 774 F.2d 97 (5th Cir.1985), *stay granted,* No. 85–5555 (October 4, 1985); *Celestine v. Blackburn,* 750 F.2d 353 (5th Cir.1984), *stay granted,* — U.S. ——, 106 S.Ct. 31, 87 L.Ed.2d 707 (1985); *Bowden v. Kemp,* 774 F.2d 1494 (11th Cir. 1985), *stay granted,* — U.S. ——, 106 S.Ct. 213, 88 L.Ed.2d 182 (1985).

These conflicting stay decisions do not appear to turn on the variety of *Grigsby* claim presented in each case—that is, whether what is challenged is the actual removal of death-scrupled jurors (for cause or on peremptory strikes), or simply the process of death-qualification itself. For example, on *Grigsby* cases from this Circuit, the high court has stayed the executions of petitioners asserting only the general death-qualification claim. *See Adams v. Wainwright, stay denied,* — U.S. ——, 106 S.Ct. 1254, 89 L.Ed.2d 362 (1986), *stay granted,* — U.S. ——, 106 S.Ct. 1371, 89 L.Ed.2d 598 (1986), *stay lifted,* — U.S. ——, 106 S.Ct. 1505, 89 L.Ed.2d 906 (1986); *Bowden v. Kemp, supra. But see Harich v. Wainwright, stay denied,* — U.S. ——, 106 S.Ct. 1392, 89 L.Ed.2d 707 (1986). Yet the Court has denied a stay in a case (other than that at bar) presenting the strongest kind of *Grigsby* claim, where death-scrupled jurors were excused for cause. *See Jones, supra.* And on one petition for stay narrowly granted by the Court, *James v. Wainwright, stay granted,* — U.S. ——, 106 S.Ct. 1393, 89 L.Ed.2d 707 (1986), *stay continued,* — U.S. ——, 106 S.Ct. 1512, 89 L.Ed.2d 912 (1986), one justice voted for the stay because "persons on the venire who expressed reservations as to capital punishment were removed by peremptory challenges," *Harich, supra,* (Powell, J. concurring)—while another justice noted that the petitioner "relied solely on the juror's exposure to death qualification; he nowhere claimed that the exclusion of jurors via peremptory strikes brought his case within the scope of *McCree*," *id.* (Marshall, J. concurring).

Ours is not the only circuit left in confusion by the high court's decisions. The Fifth Circuit has, in sequence: (1) denied a stay and rejected a *Grigsby* claim in a case in which the Supreme Court later granted a stay, *Celestine, supra;* (2) rejected a stay on a second *Grigsby* claim, *Watson v. Blackburn,* 756 F.2d 1055 (5th Cir.1985); (3) stayed an execution to permit petitioner to apply to the Supreme Court for certiorari and a further stay on the possibility that certiorari would be granted in *Grigsby, Berry v. King,* 765 F.2d 451 (5th Cir.1985); (4) rejected another *Grigsby* claim, vacating a stay by the lower court and dismissing the appeal, *Rault v. State of Louisiana,* 772 F.2d 117, 133–34 (5th Cir.1985); (5) rejected yet another *Grigsby* claim and denied a stay, which the Supreme Court in turn granted one day later, *Moore, supra;* (6) revisited *Rault,* denying a rehearing but granting a stay based on the Supreme Court's stays in *Celestine* and *Moore, Rault v. State of Louisiana,* 774 F.2d 675 (5th Cir.1985); (7) denied a stay in a *Grigbsy* case, observing that "until the Supreme Court affirms [*Grigsby* ], we are bound by the law of this circuit," *Wicker v. McCotter,* 783 F.2d 487 (5th Cir.1986); and (8) and stayed an execution "[b]ecause the Supreme Court now has under consideration the *Grigsby* issue and has consistently stayed the execution of sentence in all pending petitions for habeas corpus raising that issue ...," *Wingo v. Blackburn,* 783 F.2d 1046 (5th Cir.1986).

Widely varying results of this sort are clearly intolerable to a system committed not to impose or execute sentences of death "in an arbitrary and capricious manner," *Gregg v. Georgia,* 428 U.S. 153, 188, 96

S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1975) (opinion of Stewart, Powell and Stevens, JJ.)—a system that seeks to "produce even-handed justice," *Furman v. Georgia*, 408 U.S. 238, 399, 92 S.Ct. 2726, 2808, 33 L.Ed.2d 346 (Burger, C.J., dissenting). In the face of this confusion, I urge this Court to pause in its rush to dispose of these petitions and to think carefully about our responsibilities.

The practice of this Court in *Grigsby* cases has been simply to ignore the Supreme Court's grant of certiorari in *McCree* and to punt—there is no better word—to that Court for any contrary stay decisions. *See Bowden, supra* (observing that the law of this Circuit would oblige us to reject a *Grigsby* claim on its merits—and that "[t]he grant of the writ of certiorari in *Grigsby* is no authority to the contrary; any implications to be drawn therefrom may be discerned by application to the Supreme Court"). I submit that this is a cynical, and indeed improper, abdication of responsibility. Nothing in our Congressional mandate or in the jurisprudence of the "great writ" permits us to sidestep issues properly before us on habeas in favor of the Supreme Court. Indeed, the authority is to the contrary: "There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus...." *Harris v. Nelson*, 394 U.S. 286, 292, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1968). If we had no obligation to exercise our judgment in such cases, then federal habeas and stay petitions could simply be filed with the Supreme Court, bypassing the lower federal courts entirely.

This obligation to decide certainly may not permit us to conclude that the Supreme Court's grant of certiorari in *McCree* means that it will disagree with our Circuit's substantive law on the *Grigsby* claim. But neither does it support the contrary view. What we *can* say with confidence in such a situation—and what we not only have an obligation to say, but have traditionally said—is "that the state of the law with respect to these issues is unsettled." *Adams v. Wainwright*, 734 F.2d 511 (11th Cir.1984). And where such issues of constitutional magnitude are unsettled, and human life is at stake, we have routinely thought it prudent to stay executions on our own authority pending resolution of these issues. *See, e.g., id.* To do otherwise is to hold, sub rosa, that as far as this Circuit is concerned, only McCree himself will benefit from a favorable decision in his case.

The dissent in *Rault* advocated our own ill-chosen practice of lying low and hoping that the Supreme Court will act: "Before staying cases of this kind we should await an express, affirmative statement by the Supreme Court that executions should be stayed in cases presenting the *Grigsby* issue. Our precedents clearly establish that a prisoner is not entitled to relief on a *Grigsby* claim. The grant of certiorari in *Lockhart v. McCree* does not suggest that a *Grigsby* claim has validity." *Rault, supra* (Garwood, J., dissenting). But that view was squarely rejected by the Fifth Circuit, which determined to decide rather than to abdicate in such cases. *Wingo* demonstrates that the Fifth Circuit will now stay executions in which the petitioner presents a valid *Grigsby* claim until the Supreme Court resolves the issue.

Our practice should be no less responsible.

III. Other claims.

Petitioner raises two other claims that I am persuaded are sufficiently meritorious to warrant a stay of execution and an evidentiary hearing.

1. *Caldwell* claim.

*Caldwell v. Mississippi*, —— U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which controls petitioner's claim that certain statements by the prosecutor and the judge in his case diminished the jury's sense of responsibility for its verdict in violation of the Eighth Amendment, was issued after Thomas filed his first habeas petition. Thus, petitioner's *Caldwell* claim is properly before this Court.

On voir dire the judge and the prosecutor repeatedly let the jurors at Thomas' trial

know that their sentencing recommendation was only advisory, not binding on the court. The trial judge also made this point in his preliminary sentencing instructions to the jury. This representation was misleading. As this Court said in *Adams v. Wainwright*, 764 F.2d 1356, 1364 (11th Cir. 1985):

> The jury's role in an advisory sentencing proceeding is critical. A verdict recommending life imprisonment establishes an important set of parameters beyond which a trial judge may exercise his discretion in reaching a sentence of death only if "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ. *Tedder v. State*, 322 So.2d 908 (Fla.1975).

In my view, this iteration of an incorrect standard by the judge and the prosecutor—suggesting that the judge alone was responsible for Thomas' death sentence—may have improperly diminished the jury's sense of its actual responsibility for sentencing in Thomas' case. Although Thomas does not present a pure *Caldwell* claim—that is, one in which jurors are specifically told by the prosecutor, "your job is reviewable"—his constitutional argument deserves searching consideration on the record. I would grant an evidentiary hearing.

2. *Brady* claim.

I am persuaded that Thomas does not abuse the writ in claiming for the first time here that the state suppressed exculpatory FBI evidence showing that the fingerprints of Lee O. Martin, not those of Thomas, were found on the murder weapon. The state also failed to produce certain prison and medical records showing that Martin, as well as Thomas, had scars or welts on his legs—a feature emphasized in the victim's description of her assailant. I am not convinced that Thomas' failure to raise these claims earlier may be attributed to his own "intentional abandonment" or "inexcusable neglect." *Witt v. Wainwright*, 755 F.2d 1396 (11th Cir.1985). Petitioner relied on the trial court's assurance, after an in camera review, that no exculpatory evidence was withheld. Only this year did petitioner actually obtain the fingerprint report under the Freedom of Information Act.

To justify a new trial on a *Brady* violation Thomas must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985). The defense's theory was that Martin committed the crime. In my view the fingerprint evidence is more probative than the district court believed, since the gun found in Martin's house not only disclosed Martin's fingerprints but also yielded none of Thomas'. The scar or welt evidence may also be material. Whether this evidence, taken together, would have changed the trial's outcome simply cannot be assessed thoughtfully in these summary proceedings. I would grant an evidentiary hearing on this claim.

Accordingly, I dissent.